# United States Court of Appeals for the Federal Circuit

---

QINGDAO SEA-LINE TRADING CO., LTD.,
*Plaintiff-Appellant,*

v.

UNITED STATES,
*Defendant-Appellee,*

AND

FRESH GARLIC PRODUCERS ASSOCIATION,
CHRISTOPHER RANCH L.L.C., THE GARLIC
COMPANY, VALLEY GARLIC, AND VESSEY AND
COMPANY, INC.,
*Defendants-Appellees.*

---

2013-1581

---

Appeal from the United States Court of International Trade in No. 10-CV-0304, Judge Richard K. Eaton.

---

Decided: September 10, 2014

---

ROBERT T. HUME, Hume & Associates LLC, of Ojai, California, argued for plaintiff-appellant.

RICHARD P. SCHROEDER, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Depart-

ment of Justice, of Washington, DC, argued for defendant-appellee.  With him on the brief were STUART F. DELERY, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and REGINALD T. BLADES, JR., Assistant Director.  Of counsel on the brief was WHITNEY M. ROLIG, Attorney, United States Department of Commerce, Office of the Chief Counsel for Import Administration, of Washington, DC.

MICHAEL J. COURSEY, Kelley Drye & Warren LLP, of Washington, DC, argued for defendants-appellees.  With him on the brief was JOHN M. HERRMANN.

---

Before NEWMAN, REYNA, and CHEN, *Circuit Judges.*

REYNA, *Circuit Judge.*

Qingdao Sea-line Trading Company ("Sea-line") appeals a decision of the Court of International Trade affirming the Department of Commerce's final remand results in a new shipper review and assignment of an antidumping duty on Sea-line's imports of fresh whole garlic bulbs from the People's Republic of China.  For the reasons set forth below, we *affirm*.

I

## A. NEW SHIPPER REVIEW

Sea-line challenges the Department of Commerce's ("Commerce") calculation of its antidumping duty, which it contends is not supported by substantial evidence. Commerce calculated the antidumping duty as part of a new shipper review initiated at Sea-line's request on an outstanding 1994 antidumping order on fresh garlic

imports from China.[1]  A new shipper review covers imports by an importer or producer that was not subject to the initial antidumping duty investigation and believes it is entitled to an individual antidumping duty margin. 19 U.S.C. § 1675(a)(2)(B).  New shipper reviews cover imports made during a period subsequent to the period of review for the initial investigation.

Commerce conducted Sea-line's new shipper review for the period of November 1, 2008 through April 30, 2009.  Because China is a non-market economy, Commerce calculated the factors of production of Sea-line's fresh whole garlic using surrogate values from a comparable market economy.  19 U.S.C. § 1677b(c)(1).  Commerce chose India as the primary comparable market economy for this review and sought to identify a surrogate value for the "fresh garlic bulb" intermediate input instead of calculating values for the individual factors of production used to produce that input.  Commerce relied on price data from the Azadpur Agricultural Produce Marketing Committee's Market Information Bulletin ("APMC Bulletin"), which reports daily prices in India for garlic bulbs of various "grades."  Garlic bulbs are divided into four grades based on size:  grade Super A (greater than 55 mm); grade A (40-55 mm); grade B (30-40 mm); and grade C (less than 30 mm).

Sea-line reported a bulb size of over 55 millimeters for the garlic imported into the United States during the period of review, placing its garlic bulbs in the grade Super A category.  The APMC Bulletin, however, did not report any prices for grade Super A bulbs for the period of review.  Commerce thus averaged the closest available data points for grade Super A garlic in the APMC Bulle-

---

[1]  *See* Fresh Garlic from the People's Republic of China, 59 Fed. Reg. 59,209 (Dep't of Commerce Nov. 16, 1994).

tin, which was for November 2007 through April 2008. To make this value contemporaneous with the period of review and account for inflation, Commerce applied the Wholesale Price Index ("WPI") for India published by the International Monetary Fund ("IMF"). Applying the IMF index resulted in a slight increase in the price for grade Super A garlic, even though the prices listed in the APMC Bulletin for the other garlic grades dropped just before the period of review.

In addition to calculating surrogate values for Sea-line's fresh garlic, Commerce also calculated a "surrogate financial ratio" to account for general expenses, factory overhead, and profit. *See* 19 U.S.C. § 1677b(c)(1). This ratio is determined using financial statements and other non-proprietary information from producers of identical or comparable merchandise in the surrogate country. 19 C.F.R. § 351.408(c)(4). If financial statements are available from multiple producers, Commerce averages the financial ratios derived from all the financial statements.[2]

Commerce calculated a surrogate financial ratio for Sea-line by averaging financial statements from two Indian tea producers, Limtex Tea Limited ("Limtex") and Tata Tea Limited ("Tata Tea"). Commerce noted that "tea, rice, and vegetable processing is similar to garlic because each is not highly processed or preserved prior to sale." J.A. 137. Commerce thus decided to use financial data from Limtex and Tata Tea because tea is comparable to whole and peeled garlic, and each company's production process is similar to that of Sea-line's garlic producer, Jinxiang County Juxinyan Trading Co.

---

[2] *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1368 (Fed. Cir. 2010).

Commerce published its preliminary results on May 5, 2010, and Sea-line challenged those results in two case briefs submitted to Commerce on June 4, 2010 and August 6, 2010. First, Sea-line argued that Commerce should not have relied on non-contemporaneous grade Super A garlic prices or used the IMF WPI index to inflate those prices. Second, Sea-line argued that Tata Tea's financials should not have been used to calculate the surrogate financial ratio in lieu of those from a different company, Garlico Industries, because Tata Tea's production process is not sufficiently comparable to the production of fresh whole garlic.

Commerce considered and rejected Sea-line's challenges in its final results. Commerce continued to rely on prices from outside the period of review for grade Super A garlic after concluding that size-specific price information was preferable because "size is an important price factor." J.A. 208. Commerce also rejected Sea-line's argument that a consistent relationship existed between the prices for grade Super A garlic and grade A garlic:

> [W]e note that there is no historical price information on the record of this review to support Qingdao Sea-line's apparent contention that price trends for Super-A grade would mirror those of the A grade price. Moreover, Qingdao Sea-line's own arguments about the relative scarcity of large-bulb garlic (i.e., Super-A grade) in India resulting in higher prices for large-bulb garlic contradict its contention that prices for Super-A grade (the largest Indian variety) would mirror those of smaller sized garlic.

*Id.* (emphasis original). Commerce thus continued to rely on non-contemporaneous prices for grade Super A garlic in its final results.

Commerce also continued to use the IMF WPI index to inflate the older Super A garlic prices, noting that it

has used the same index in prior reviews. Commerce refused to use either of two alternative methods that Sea-line claimed would have resulted in a more accurate garlic surrogate value. Commerce rejected a "garlic-specific WPI" index calculated by Sea-line after noting that Sea-line did not provide any information on the price data that presumably underpinned the proposed index. Commerce also rejected Sea-line's alternative proposal to adjust the non-contemporaneous prices using a calculated ratio between grade Super A and grade A prices. Commerce concluded that "there is insufficient historical Azadpur APMC price data (Super-A grade and A grade) on the record of this review to serve as the basis for a meaningful price ratio." J.A. 211. Commerce thus continued to adjust the grade Super A garlic prices using the IMF WPI index.

Finally, Commerce continued to rely on Tata Tea's financials to calculate a surrogate financial ratio. Commerce rejected Sea-line's argument that Commerce's decision is inconsistent with prior reviews, noting that prior reviews had also concluded that tea is comparable to garlic. Commerce further noted that the majority of Tata Tea's sales are comprised of tea. Commerce therefore concluded that Tata Tea's financials reflect the best available information on the record.

Based on its calculations, Commerce imposed on Sea-line an antidumping margin of 155.33% and a per-unit cash deposit rate of $1.28 per kilogram.[3] Sea-line appealed Commerce's final results to the Court of International Trade ("Trade Court").

---

[3]    Fresh Garlic from the People's Republic of China: New Shipper Review, 75 Fed. Reg. 61,130, 61,131 (Dep't of Commerce Oct. 4, 2010) (final results).

## B. First Appeal to the Trade Court

In its pleadings before the Trade Court, Sea-line reiterated its challenges to Commerce's calculations, taking issue with Commerce's (i) reliance on non-contemporaneous prices and use of the IMF WPI index to inflate those prices; and (ii) use of Tata Tea's financials in lieu of Garlico's financials.

On March 21, 2012, the Trade Court granted-in-part Sea-line's motion for judgment on the administrative record and remanded Commerce's final results for further clarification.[4] The Trade Court agreed with Sea-line that Commerce failed to sufficiently explain why garlic size is such an important price factor that it justified using prices outside the period of review. The Trade Court noted that Commerce's statement that "garlic size is an important price factor" is insufficient to explain why garlic size trumps contemporaneity in its choice of prices. The Trade Court also concluded that Commerce did not adequately explain why it was reasonable to use Tata Tea financials given findings in prior reviews that Tata Tea's production process was not comparable to whole garlic, as well as why it was reasonable to not consider the financial statements of Garlico Industries. The Trade Court thus remanded for Commerce to more adequately explain its conclusions.

The Trade Court, however, affirmed Commerce's use of the IMF WPI index as an inflator in the event that Commerce sufficiently justifies its use of garlic prices outside the period of review. The Trade Court determined that Commerce reasonably rejected both of Sea-line's proposed alternative methods for obtaining contempora-

---

[4] *Qingdao Sea-Line Trading Co. v. United States*, No. 10-00304, 2012 WL 990904 (Ct. Int'l Trade Mar. 21, 2012) ("*Qingdao I*").

neous grade Super A prices. First, the Trade Court noted that Commerce refused to use Sea-line's proposed garlic-specific WPI index after concluding that Sea-line failed to provide sufficient data to verify the index. Sea-line created the garlic-specific WPI in its case brief to Commerce and provided no explanation or context for how the Indian government compiled the underlying data. Sea-line also provided an erroneous website address as the source of the data and otherwise failed to provide a verifiable source to Commerce. The Trade Court thus affirmed Commerce's refusal to use Sea-line's garlic-specific WPI, noting that it "is particularly the duty of a party to complete the record when, as here, plaintiff is proffering data that it claims is the 'best available information.'" *Qingdao I*, 2012 WL 990904 at *7.

Second, the Trade Court held that Commerce reasonably rejected Sea-line's proposed method of calculating a price ratio between grade Super A and grade A garlic prices to arrive at a contemporaneous surrogate value. To support this method, Sea-line noted that it could "presume" that the prices between grade Super A and grade A garlic remain "relatively constant." The Trade Court noted, however, that Commerce concluded that one year of data on the price differences between grade Super A and grade A garlic was insufficient to show a consistent ratio over time, and Sea-line failed to provide additional evidence establishing that its proposed ratio remained constant over a period of years. The Trade Court thus concluded that Sea-line failed to show that its proposed ratio would be more accurate than using the IMF WPI index to adjust the older Super A prices.

## C. COMMERCE'S REMAND RESULTS

On remand, Commerce further explained its calculations and reaffirmed its decisions to (i) focus on garlic size over contemporaneity; (ii) rely on the Tata Tea financial statements; and (iii) exclude Garlico's financial state-

ments from consideration. Commerce first noted that it "has consistently determined that the size of garlic bulb is the most important factor in determining garlic prices." J.A. 343. Commerce supplemented the record with additional documents showing that purchasers pay a premium for large-bulb garlic and that India coined "grade Super A" garlic as a way to separate new varieties of large-bulb garlic from the more traditional grade A garlic. Commerce further noted that Sea-line's own information indicates that its customers rely primarily on size when purchasing garlic. Commerce therefore continued to rely on non-contemporaneous grade Super A prices.

Commerce also reaffirmed its reliance on Tata Tea's 2008-09 financial statement despite deciding in previous administrative reviews to reject the use of Tata Tea's financials after concluding that Tata Tea was primarily involved in producing highly-processed or preserved products. First, Commerce noted that previous administrative reviews relied on a financial statement from 2003-04, whereas the current review relies on a statement from 2008-09. Commerce reviewed the 2008-09 financial statement and found little evidence that Tata Tea's production process for this period was heavily focused on processed products. Commerce noted that 89 percent of Tata Tea's sales were of branded products, but refused to conclude that "branded products" implies "highly-processed goods." Commerce further noted that instant tea sales, which are highly processed, represented only about 1.3 percent of Tata Tea's total tea sales and that no additional evidence indicated that the remainder of Tata Tea's sales involved highly-processed merchandise. Commerce therefore rejected Sea-line's claim that reliance on Tata Tea's financial statement was improper because Tata Tea's production process was not comparable to the production of fresh whole garlic.

Finally, Commerce reaffirmed its rejection of Garlico's financial statements after finding inconsistences and

calculation errors in the underlying data. Commerce also found that about 91 percent of Garlico's sales were of non-fresh products produced through extensive drying and processing and were thus not comparable to Sea-line's production of fresh garlic. Commerce therefore continued to disregard Garlico's financial statements in its surrogate financial ratio calculation.

### D. SECOND APPEAL TO THE TRADE COURT

Sea-line again appealed to the Trade Court, and the court affirmed.[5] The Trade Court held that Commerce reasonably explained why garlic size was more important than contemporaneity for purposes of establishing garlic prices. The Trade Court further held that substantial evidence supported Commerce's decision to rely on the financial statements of Tata Tea in lieu of those of Garlico. According to the Trade Court, Commerce reasonably concluded that Tata Tea's 2008-09 financial statement revealed that only a small amount of Tata Tea's production involved highly-processed products and that the 2008-09 statement differed from those relied upon in previous reviews. The Trade Court also held that substantial evidence supported Commerce's conclusion to reject Garlico's financial statement on the basis that it contained numerical errors and was not reliable and because Garlico's products were highly processed and thus not comparable to Sea-line's production of fresh garlic.

On appeal, Sea-line asks us to reverse the Trade Court's decision and hold that Commerce erred in (i) relying on non-contemporaneous grade Super A garlic prices and the IMF WPI index to adjust those prices; and

---

[5] *Qingdao Sea-Line Trading Co. v. United States*, No. 10-00304, 2013 WL 4038618 (Ct. Int'l Trade Aug, 8, 2013) ("*Qingdao II*").

(ii) using the Tata Tea financial statement instead of Garlico's financial statement to calculate the surrogate financial ratio.  We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## II

We review decisions of the Trade Court de novo and apply anew the same standard used by the Trade Court.[6] Commerce's antidumping determinations are reviewed for substantial evidence.  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is defined as "more than a mere scintilla," as well as evidence that a "reasonable mind might accept as adequate to support a conclusion."[7]  Our review is limited to the record before Commerce in the particular review proceeding at issue and includes all evidence that supports or detracts from Commerce's conclusion.[8]  An agency finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence.[9]

### A. IMF WPI INDEX

Sea-line argues that Commerce's decision to use non-contemporaneous grade Super A garlic prices and to inflate those prices using the IMF WPI index is not supported by substantial evidence.  Sea-line argues that the record shows that Indian garlic prices fell just before the

---

[6]   *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1380 (Fed. Cir. 2008).

[7]   *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938).

[8]   *Sango Int'l L.P. v. United States*, 567 F.3d 1356, 1362 (Fed. Cir. 2009); *see also QVD Food Co. v. United States*, 658 F.3d 1318, 1324-25 (Fed. Cir. 2011) (citing 19 U.S.C. § 1516a(b)(2)(A)).

[9]   *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

period of review and that Commerce's use of the IMF index resulted in a distorted and inaccurate surrogate value for Sea-line's garlic. We disagree.

In an administrative review of a non-market economy, Commerce is required to calculate surrogate values for the subject merchandise using the "best available information." 19 U.S.C. § 1677b(c)(1). Commerce has broad discretion to determine what constitutes the best available information, as this term is not defined by statute.[10] Commerce generally selects, to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review.[11]

Substantial evidence supports Commerce's surrogate value calculation for Sea-line's whole garlic bulbs. Sea-line does not dispute that its garlic bulb imports are of the grade Super A size, and the record shows that the APMC Bulletin did not report any prices for Super A bulbs during the period of review. The record further supports Commerce's conclusion that garlic bulb size is a more important factor than contemporaneity. Consumers often pay a premium for large-bulb garlic, and the information submitted by Sea-line shows that its own customers rely primarily on size when purchasing garlic. Commerce thus reasonably concluded that the best available information consisted of non-contemporaneous grade Super A prices.

The record further supports Commerce's decision to use the IMF WPI index to adjust the non-

---

[10]   *QVD Food Co.*, 658 F.3d at 1323.

[11]   *QVD Food Co. v. United States*, 721 F. Supp. 2d 1311, 1315 (Ct. Int'l Trade 2010); *see also* Fresh Garlic from the People's Republic of China: New Shipper Review, 75 Fed. Reg. 24,578, 24,581 (Dep't of Commerce May 5, 2010) (prelim. results).

contemporaneous garlic prices.  Commerce first noted that it has used the IMF index in prior administrative reviews to adjust prices.  Commerce further found that Sea-line failed to provide sufficient evidence showing that either of its proposed alternative methods would yield a more accurate result.  Commerce reasonably rejected Sea-line's proposed garlic-specific inflation index on the grounds that Sea-line failed to provide any explanation or context for the underlying data.  Commerce was unable to verify the index because Sea-line did not provide the correct source of the data.  Commerce also rejected Sea-line's price-ratio method after concluding there was insufficient historical data in the record to establish a reliable ratio between grade Super A and grade A prices.  Commerce found that Sea-line failed to provide additional evidence establishing that its proposed ratio remained constant over a period of years.  Accordingly, Commerce reasonably concluded that the IMF index constituted the best available information in the record.

We disagree with Sea-line that Commerce's decision to inflate the Super A garlic prices is inconsistent with evidence showing that the prices for grades A, B, and C fell just before the period of review.  Commerce's decision to use the IMF WPI index is not inconsistent with the record.  As discussed above, Sea-line failed to show that Super A prices closely follow changes in other garlic prices.  Once Commerce selected the IMF WPI index as the best available adjustment method, Sea-line had the duty to submit verifiable evidence showing that use of the index was not the best available method of adjusting the non-contemporaneous prices.  The burden of creating an adequate record lies with the interested parties, not with

Commerce.[12]  Sea-line failed to provide such evidence.  As a result, we conclude that Commerce's decision to rely on bulb size and the IMF index is reasonable and supported by substantial evidence.

### B. SURROGATE FINANCIAL RATIO

Sea-line argues that Commerce should not have used Tata Tea's 2008-09 financial statement to calculate the surrogate financial ratio because Tata Tea produces highly-processed products and is thus not reasonably comparable to Sea-line's production of fresh whole garlic. We do not agree.

Commerce's reliance on Tata Tea's 2008-09 financial statement as a reasonable comparison to Sea-line's production process is supported by substantial evidence. Commerce reviewed Tata Tea's financial statement and found little evidence that Tata Tea's production process for this period was heavily focused on processed or preserved products.  Commerce noted that, while 89 percent of Tata Tea's sales were of branded products, neither the financial statement nor any other evidence shows that branded products are highly-processed goods.  Commerce further noted that sales of instant tea, which are highly processed, represented only about 1.3 percent of Tata Tea's total tea sales and that the record contained no additional evidence that the remainder of Tata Tea's sales involved highly-processed merchandise.

Commerce also explained why its reliance on the 2008-09 financial statement was reasonable.  Commerce noted that although it rejected Tata Tea's 2003-04 financial statement in previous administrative reviews, Commerce examined the differences between the two financial

---

12  *QVD Food Co.*, 658 F.3d at 1324; *see also Jinan Yipin Corp. v. United States*, 971 F. Supp. 2d 1296, 1314 (Ct. Int'l Trade 2014).

statements and concluded that, unlike the 2003-04 financial statement, the 2008-09 financial statement supports a finding that highly-processed products represented a small portion of Tata Tea's total production for the period of review.

We also hold that Commerce may change its conclusions from one review to the next based on new information and arguments, as long as it does not act arbitrarily and it articulates a reasonable basis for the change. Indeed, the Trade Court has recognized that each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record.[13] Here, Commerce explained the differences between the two financial statements and reasonably concluded that the 2008-09 financial statement, as the only Tata Tea statement on the record, supports a finding that Tata Tea's production process is sufficiently comparable to Sea-line's process. Hence, Commerce's decision to rely on Tata Tea's 2008-09 financial statement to calculate Sea-line's surrogate financial ratio was not improper.

We also reject Sea-line's argument that Garlico's financial statement should have been used instead of Tata Tea's financial statement. Commerce refused to use Garlico's financial statement after finding several material errors that called into question the statement's overall quality and reliability. These errors included discrepancies in the underlying figures and were not attributable to accounting system differences. Commerce also found that about 91 percent of Garlico's sales involved highly processed vegetable products that were not sufficiently comparable to Sea-line's sales of fresh whole garlic.

---

[13]  *Cinsa, S.A. de C.V. v. United States*, 966 F. Supp. 1230, 1238 (Ct. Int'l Trade 1997).

Sea-line does not show error in Commerce's conclusion that Garlico's statement contains inaccuracies and reflects a high percentage of highly-processed products. Sea-line's argument in response is that because Garlico sells garlic-based products, its production process must necessarily be more comparable to Sea-line's production of fresh whole garlic. This general assertion, however, is not sufficient to overcome Commerce's detailed findings. As a result, we find that Commerce's conclusion that Garlico's financial statement is not the best available information for purposes of calculating the surrogate financial ratio is reasonable and supported by substantial evidence.

Finally, Sea-line raises before us arguments not presented in its case briefs to Commerce. Commerce regulations require the presentation of all issues and arguments in a party's case brief, and we have held that a party's failure to raise an argument before Commerce constitutes a failure to exhaust its administrative remedies.[14] Accordingly, we refuse to consider those arguments not presented in the underlying administrative proceedings.

## III

For the reasons set forth above, we affirm the decision of the Trade Court.

**AFFIRMED**

---

[14] 19 C.F.R. § 351.309(c)(2); *Dorbest*, 604 F.3d at 1375.