Slip Op. 18-21

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **EVONIK REXIM (NANNING) PHARMACEUTICAL CO. LTD. AND EVONIK CORPORATION,** | |
| Plaintiffs, | |
| and | |
| **BAODING MANTONG FINE CHEMISTRY CO., LTD. and GEO SPECIALTY CHEMICALS, INC.,** | **Before: Jennifer Choe-Groves, Judge** |
| Consolidated Plaintiffs, | **Consol. Court No. 15-00296** |
| v. | |
| **UNITED STATES,** | |
| Defendant, | |
| and | |
| **GEO SPECIALTY CHEMICALS, INC.,** | |
| Defendant-Intervenor. | |

## <u>OPINION</u>

[Sustaining the U.S. Department of Commerce's remand redetermination in the 2013–2014 administrative review of the antidumping duty order on glycine from the People's Republic of China.]

Dated: March 12, 2018

<u>Matthew T. McGrath</u>, Barnes, Richardson & Colburn, LLP, of Washington, D.C., for Plaintiffs Evonik Rexim (Nanning) Pharmaceutical Co. Ltd. and Evonik Corporation.

<u>Lizbeth R. Levinson</u>, <u>Brittney R. Powell</u>, and <u>Ronald M. Wisla</u>, Fox Rothschild LLP, of Washington, D.C., for Consolidated Plaintiff Baoding Mantong Fine Chemistry Co., Ltd.

Joshua E. Kurland, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States.  With him on the brief were Chad A. Readler, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, Reginald T. Blades, Jr., Assistant Director, and Robert M. Norway, Trial Attorney.  Of Counsel on the brief was Nanda Srikantaiah, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

David M. Schwartz, Thompson Hine LLP, of Washington, D.C., for Consolidated Plaintiff and Defendant-Intervenor GEO Specialty Chemicals, Inc.

Choe-Groves, Judge:  This consolidated action involving a remand determination was brought by Evonik Rexim (Nanning) Pharmaceutical Co. Ltd. and Evonik Corporation (collectively, "Evonik" or "Plaintiffs"), Baoding Mantong Fine Chemistry Co., Ltd. ("Baoding"), and GEO Specialty Chemicals, Inc. ("GEO") (collectively, "Consolidated Plaintiffs") for judicial review of decisions made by the U.S. Department of Commerce ("Commerce" or "Department") during the 2013–2014 administrative review of the antidumping duty order on glycine from the People's Republic of China ("China" or "PRC").  See Glycine From the People's Republic of China, 80 Fed. Reg. 62,027 (Dep't Commerce Oct. 15, 2015) (final results of antidumping duty administrative review and partial recession of antidumping duty administrative review; 2013–2014) ("Final Results"); see also Issues and Decision Memorandum for the Final Results of Antidumping Administrative Review, A-570-836 (Oct. 5, 2015), available at https://enforcement.trade.gov/frn/summary/prc/2015-26270-1.pdf (last visited Mar. 6, 2018) ("I&D Memo").  Before the court are the Final Results of Redetermination Pursuant to Court Remand, Oct. 20, 2017, ECF No. 83 ("Remand Results"), filed by the Department pursuant to the court's remand order in Evonik Rexim (Nanning) Pharmaceutical Co. Ltd. v. United States,

41 CIT __, 253 F. Supp. 3d 1364 (2017) ("Evonik").  For the reasons set forth below, the court sustains the Remand Results.

## BACKGROUND

Commerce issued the Final Results and accompanying memorandum on October 15, 2015.  See Final Results, 80 Fed. Reg. at 62,027.  In the Final Results, Commerce calculated Baoding's normal value by using import statistics for aqueous ammonia as the surrogate value for Baoding's liquid ammonia factor of production input, and used financial statements from two Indonesian companies to determine the surrogate financial ratios.  See id.; I&D Memo at 11–12, 17–19.  Commerce assigned Baoding a weighted-average dumping margin of 143.87 percent. See Final Results, 80 Fed. Reg. at 62,028.

Plaintiffs and Consolidated Plaintiffs initiated multiple actions challenging Commerce's determination.  The court sustained Commerce's determinations that (1) Evonik's sales during the period of review were not *bona fide*, (2) Baoding's sale was *bona fide*, and (3) Baoding should receive a by-product offset.  Evonik, 41 CIT at __, 253 F. Supp. 3d at 1377–78.  The court remanded the Department's findings with respect to Baoding on (1) the surrogate value selection for liquid ammonia, and (2) the selection of companies used for Baoding's surrogate financial ratios.  Id. at __, 253 F. Supp. 3d at 1378.  In remanding the two issues, the court explained that Commerce should have accepted Baoding's administrative case brief as originally submitted to the Department on May 8, 2015, and should have addressed Baoding's arguments regarding the surrogate value selection.  Id. at __, 253 F. Supp. 3d at 1373–75.  The court found further that the Department failed to adequately support its determination that the two Indonesian companies engaged in similar production processes to Baoding.  Id. at __, 253 F. Supp. 3d at

1375–76. Accordingly, the court instructed Commerce to readdress the two issues on remand. Id. at __, 253 F. Supp. 3d at 1378.

The Department filed the final Remand Results on October 20, 2017. See Remand Results. Commerce followed the court's instructions, accepted Baoding's administrative case brief, and provided GEO with an opportunity to respond. See id. at 1. After considering both parties' arguments, Commerce determined that the Global Trade Atlas ("GTA") import data for anhydrous ammonia was the most product-specific data placed on the record for the period of review for Baoding's liquid ammonia input. See id. at 12. The Department determined also that PT Budi's financial information should be used to generate surrogate financial ratios for Baoding because the Indonesian company produced merchandise comparable to glycine. See id. at 15. Pursuant to its modified calculations, the Department assigned Baoding a weighted-average dumping margin of zero percent. See id. at 21–22. Baoding filed a comment in support of the Remand Results. See Consolidated Pl.'s Comments Final Remand Results, Nov. 20, 2017, ECF No. 87. GEO challenges the Remand Results, contending that Commerce's two findings are not supported by substantial evidence and not in accordance with law. See Def.-Intervenor's Comments Final Results Redetermination Pursuant Ct. Remand 8, Nov. 20, 2017, ECF No. 85 ("GEO Comments"). Defendant responded to both comments. See Def.'s Corrected Resp. Comments Remand Redetermination, Dec. 18, 2017, ECF No. 92.

## JURISDICTION

The court has jurisdiction over Commerce's final determination in an administrative review of an antidumping duty order.  See 28 U.S.C. § 1581(c) (2012);[1] 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012).[2]  The court will uphold the Department's "determinations, findings, or conclusions" unless "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  The court assesses whether the agency's actions are "unreasonable" given the record as a whole.  See Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006).

## DISCUSSION

When conducting an antidumping duty investigation involving a non-market economy ("NME"), if Commerce determines that available information does not permit the use of the standard normal value calculation, then the Department will calculate normal value using the best available information from "a market economy country or countries considered to be appropriate by" the agency.  19 U.S.C. § 1677b(c)(1)(B).  Commerce will examine "the value of the factors of production utilized in producing the merchandise" plus "the cost of containers, coverings, and other expenses."  Id.  The statute directs the Department to "utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are-- (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise."  Id. § 1677b(c)(4).

---

[1] Further citations to Title 28 of the U.S. Code are to the 2012 edition.

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

When valuing the factors of production, the Department "normally will use non-proprietary information gathered from producers of identical or comparable merchandise in the surrogate country." 19 C.F.R. § 351.408(4) (2014); see also Remand Results 13. It is the agency's policy "to use data from market-economy surrogate companies based on specificity, contemporaneity, and quality of the data." Remand Results 13–14 (footnote omitted); see also Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1386 (Fed. Cir. 2014). The Department furthermore has "developed a three-part test for identifying comparable merchandise which examines, where appropriate, the physical characteristics, end uses, and production processes." Remand Results 14. Finally, the Department will take into account the proposed surrogate company's production experience in comparison to the NME respondent's production experience. Id.

**I.     Commerce's Switch to the Anhydrous Ammonia Surrogate Value**

Commerce originally selected the surrogate value for aqueous ammonia to calculate Baoding's normal value. Evonik, 41 CIT at __, 253 F. Supp. 3d at 1369. The court directed Commerce to accept Baoding's brief, which supported the use of the surrogate value for anhydrous ammonia, and consider its arguments on the merits. See id. at __, 253 F. Supp. 3d at 1374–75. The Department did so on remand and chose anhydrous ammonia to represent the surrogate value for Baoding's liquid ammonia input. See Remand Results 11. Commerce found that the Indonesian GTA import data for anhydrous ammonia "were the most product-specific data placed on the record" for the administrative review period and "representative of a broad-market average," and, accordingly, assigned the surrogate value for liquid ammonia as $619.21 USD per metric ton. Id. at 12

GEO asserts that Commerce's switch from selecting aqueous ammonia to anhydrous ammonia for the surrogate value is not supported by the record evidence and not in accordance with law. See GEO Comments 8–9. GEO argues that Commerce reversed its position on remand despite the fact that "the record evidence on the liquid ammonia surrogate value issue did not change; all that changed was Commerce's reinstatement of the original briefs filed by Baoding and GEO providing legal arguments addressing this issue." Id. at 9. The presence of additional briefing at the administrative level was significant, however, because the Department had more information and arguments to consider in making its decision. The Department is allowed to "change its conclusions from one review to the next based on new information and arguments, as long as it does not act arbitrarily and it articulates a reasonable basis for the change." Qingdao Sea-Line Trading Co., Ltd., 766 F.3d at 1387. Commerce discussed the merits of Baoding's administrative brief and GEO's rebuttal arguments in the remand results. See Remand Results 5–12. Baoding's briefing explained in particular how mistakes contained in Baoding's questionnaire responses "as to the precise make-up of the input" in the 2010/2011 administrative review led to errors in the Department's valuation of liquid ammonia, id. at 7, as well as "why the Department determined that anhydrous ammonia had been used in the company's glycine production for" previous administrative reviews. Id. at 10. After considering the information provided by Baoding, Commerce stated, "When these earlier findings are taken into account, they support the conclusion that, based on the information provided by Baoding Mantong in the 2013/2014 [review], the valuation of liquid ammonia should be based on the import data for anhydrous ammonia." Id. at 11. Because Commerce's determination was reasonably based on record evidence, GEO's argument has little merit.

GEO contends further that the Department relied incorrectly on findings from the 2005/2006, 2006/2007, and 2007/2008 administrative reviews, which were unverified, and should have used information instead from the 2003/2004 and 2010/2011 reviews, "which were the only two reviews where Commerce verified" Baoding's factors-of-production information. See GEO Comments 11–12.  GEO asserts that deference should be given to verified findings. See id. at 12–13 (citing Timken U.S. Corp. v. United States, 28 CIT 1828, 1832 (2004)).  GEO's reliance on Timken is misplaced.  That case distinguishes between verified and unverified findings in the same administrative proceeding, see Timken U.S. Corp., 28 CIT at 1382, whereas here, GEO contends that Commerce should defer to verified findings in other administrative proceedings.  See GEO Comments 11–12.  The Department treats each proceeding independently because "each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record."  Qingdao Sea-Line Trading Co., Ltd., 766 F.3d at 1387.  Although the Department discussed previous administrative reviews, it clearly stated that it relied on the import data for anhydrous ammonia from the 2013/2014 review period placed on the record by Baoding in making its decision.  See Remand Results 16–17.  The court concludes that Commerce's selection of anhydrous ammonia for the surrogate value is supported by substantial evidence and in accordance with law.

## II.    Commerce's Finding on Surrogate Financial Ratios

The Department utilizes a three-part test when determining surrogate financial ratios, which requires it to compare the physical characteristics, end uses, and production processes for the respondent's and surrogate company's goods. See Remand Results 14.  The court concluded previously that "the Department failed to adequately support its determination that PT Budi and

PT Lautan engaged in production processes comparable to Baoding's glycine production."

Evonik, 41 CIT at __, 253 F. Supp. 3d at 1376. The Department determined on remand that PT

Budi and PT Lautan "produce comparable merchandise to glycine" and "share similar, if not

identical, production processes" to Baoding. Remand Results 15. "[G]iven this conclusion and

the specificity, contemporaneity, and quality of the data provided by the" companies, the

Department found it appropriate to use the data for determining Baoding's surrogate financial

radios. Id. When reaching its ultimate determination, however, Commerce only utilized

information pertaining to PT Budi because the financial statements of PT Lautan showed "that

the majority of the company's business activities in 2013 were not related to the manufacturing

of products comparable to the subject merchandise," and were thus inappropriate to use in the

investigation. Id. at 21.

GEO asserts that the Department rejected PT Lautan's financial statement correctly, but

disagrees with the Department's determination that PT Budi satisfied the three-part test. See

GEO Comments 13–14. Defendant-Intervenor contends that PT Budi and Baoding do not share

similar production processes because there are no chemical reactions required for manufacturing

PT Budi's "primary product, tapioca starch."[3] See GEO Comments 17. GEO requests that the

_____

[3] GEO also disputes that PT Budi's products do not have similar physical characteristics or comparable end uses to Baoding's products. See GEO Comments 14–17. The Department found that PT Budi "produce[s] basic chemicals and additives to be used in food and pharmaceutical products, as does Baoding Mantong with its production of glycine," Remand Results 14, and determined that "the physical characteristics (*i.e.*, a chemical powder with sweetening properties) of the products produced by the two companies and the end uses of the products are virtually identical." Id. at 20. The court did not take issue with these two prongs of the Department's three-part test in its prior opinion, but nevertheless concludes that the Department's determinations are satisfactory.

court remand this issue and direct the Department to consider data from the companies that GEO placed on the record for surrogate financial ratios. See id. at 17–18. GEO's focus, however, is misplaced. Although PT Budi does produce tapioca starch, thirty-two percent of its revenue is derived from the manufacture and sale of sweeteners. See Financial Statements: PT Budi Starch and Sweetener Tbk at 34–35, Exhibit 7 of Evonik Surrogate Value Comments, PD 98–99, bar code 3229327-02 (Sept. 19, 2014). The Department cited to information regarding PT Budi's manufacturing process for sweeteners, along with Baoding's glycine manufacturing process. See Remand Results 14–17. The Department found, after examining these documents, that Baoding and PT Budi share similar production processes because they both "involve chemical reactions and heating, cooling and drying processes." Id. at 15. Based on the information in the record, the court concludes that this determination was supported by substantial evidence and in accordance with law.

## CONCLUSION

For the reasons set forth above, the court finds that Commerce has complied with the court's previous opinion and remand order by (1) considering Baoding's administrative brief in selecting the surrogate value for liquid ammonia, and (2) providing its reasoning with respect to the issue of financial surrogate ratios. The court concludes that Commerce's choice to utilize anhydrous ammonia for the surrogate value, as well as its selection of PT Budi as the surrogate company for determining the financial surrogate ratio, were supported by substantial evidence and in accordance with law. The court sustains Commerce's remand redetermination.

Judgment will be issued accordingly.

/s/    Jennifer Choe-Groves
Jennifer Choe-Groves, Judge

Dated: March 12, 2018
          New York, New York