NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**CARBON ACTIVATED TIANJIN CO., LTD., CARBON ACTIVATED CORPORATION,**
*Plaintiffs-Appellants*

**DATONG JUQIANG ACTIVATED CARBON CO., LTD., DATONG JUQIANG ACTIVATED CARBON USA, LLC, NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD., DATONG MUNICIPAL YUNGUANG ACTIVATED CARBON CO., LTD.,**
*Plaintiffs*

**v.**

**UNITED STATES, CALGON CARBON CORPORATION, NORIT AMERICAS, INC.,**
*Defendants-Appellees*

---

2023-2413

---

Appeal from the United States Court of International Trade in Nos. 1:22-cv-00017-MAB, 1:22-cv-00025-MAB, 1:22-cv-00026-MAB, Chief Judge Mark A. Barnett.

---

Decided:  May 9, 2025

---

STEPHANIE HARTMANN, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, argued for plaintiffs-appellants. Also represented by PATRICK KLEIN, JOHN M. PETERSON, Neville Peterson LLP, New York, NY; RICHARD F. O'NEILL, Seattle, WA.

JOSHUA E. KURLAND, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by BRIAN M. BOYNTON, CLAUDIA BURKE, PATRICIA M. MCCARTHY, ANTONIA RAMOS SOARES; ASHLANDE GELIN, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

MELISSA M. BREWER, Kelley Drye & Warren, LLP, Washington, DC, argued for defendants-appellees Calgon Carbon Corporation, Norit Americas, Inc. Also represented by JOHN M. HERRMANN, ROBERT ALAN LUBERDA.

────────────────

Before TARANTO, SCHALL, and CHEN, *Circuit Judges*.

SCHALL, *Circuit Judge*.

Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation (collectively, "Carbon Activated") are companies that export activated carbon to the United States from the People's Republic of China ("China").[1] Activated carbon is a solid carbon adsorbent material that is used to remove pollutants in gas and liquids.

Carbon Activated now appeals the decision of the United States Court of International Trade ("Trade Court")

────────────

[1] Specifically, Carbon Activated Tianjin Co., Ltd. exports activated carbon from China to the United States, where it is resold by Carbon Activated Corporation.

in *Carbon Activated Tianjin Co., Ltd. v. United States*, 650 F. Supp. 3d 1354 (Ct. Int'l Trade 2023) ("*Carbon Activated*").  In that decision, the Trade Court sustained the final results of the Department of Commerce ("Commerce") in the thirteenth administrative review ("AR13") of the antidumping duty order on certain activated carbon from China for the period April 1, 2019, through March 31, 2020. *See Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; and Final Determination of No Shipments; 2019–2020*, 86 Fed. Reg. 73,731 (Dep't Commerce Dec. 28, 2021) ("*Final Results*"), App. 7967–70.[2]  We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).  For the reasons set forth below, we *affirm*.

I

The Tariff Act of 1930, as amended, directs Commerce to impose an antidumping duty on foreign merchandise if the "merchandise is being, or is likely to be, sold in the United States at less than its fair value."  19 U.S.C. § 1673(1).  The antidumping duty reflects the amount by which the normal value (the price a producer charges in its home market) exceeds the export price (the price of the product in the United States).  *Id.* § 1673; *see U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1353 (Fed. Cir. 2010) (citation omitted).  However, in an antidumping duty proceeding involving a non-market economy country, such as China, Commerce calculates normal value "on the basis of the value of the factors of production utilized in producing the merchandise."  19 U.S.C. § 1677b(c)(1).  The statute directs Commerce to value the factors of production "based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by" Commerce.  *Id.*  The factors

---

[2]    Our citation to "App." refers to the Appendix filed by the parties, ECF Nos. 42, 43.

of production that Commerce must value include, but are not limited to, "hours of labor required," "quantities of raw materials employed," "amounts of energy and other utilities consumed," and "representative capital cost, including depreciation." *Id.* § 1677b(c)(3). The resulting values are commonly referred to as "surrogate values," and the market economy country from which the surrogate values are derived is commonly referred to as the "surrogate country." *See Risen Energy Co., Ltd. v. United States*, 122 F.4th 1348, 1352 (Fed. Cir. 2024) ("By identifying a surrogate country and surrogate values for the factors of production, Commerce approximates what a non-market economy manufacturer might pay in a market economy setting." (internal quotation marks and citation omitted)). The statute provides that, in valuing factors of production under § 1677b(c)(1), Commerce "shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are . . . at a level of economic development comparable to that of the nonmarket economy country, and . . . significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4). It is Commerce's preference to use a "primary" surrogate country as the reference point when there are several countries that are at a level of economic development comparable to the nonmarket economy country and that are significant producers of comparable merchandise. *Jiaxing Bro. Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1294 (Fed. Cir. 2016) (citing 19 C.F.R. § 351.408(c)(2)).

To select a primary surrogate country, Commerce has adopted a four-step approach. *See* Import Admin., U.S. Dep't of Commerce, *Non-Market Economy Surrogate Country Selection Process*, Policy Bulletin 04.1 (2004), http://enforcement.trade.gov/policy/bull04-1.html ("Policy Bulletin" or "Bulletin"). Relevant to this case, the Policy Bulletin provides that when there is not "adequate data available from major producing countries, . . . 'significant producer' could mean a country that is a net exporter, even though

the selected surrogate country may not be one of the world's top producers." *Id.* The Policy Bulletin defines "net exporter" as "a country whose exports exceed its imports." *Id.* at n.1.

This case presents the issues of whether, in AR13, Commerce properly determined (1) surrogate financial ratios; (2) surrogate values for certain factors of production; and (3) the surrogate value of ocean freight expenses.

## II

Since, as noted, China is a non-market economy country, in AR13 Commerce was required to select surrogate values from a surrogate country. In accordance with the Policy Bulletin, Commerce's Office of Policy ("OP") compiled a list of potential surrogate countries that were at a comparable level of economic development to China. OP identified six potential surrogate countries: Brazil, Malaysia, Mexico, Romania, Russia, and Turkey. *Carbon Activated*, 650 F. Supp. 3d at 1360. In the *Final Results*, Commerce selected Malaysia as the primary surrogate country. *Id.* It did so after determining that Malaysia was the only country on the OP list that was a significant producer of comparable merchandise because it was the only "net exporter" of such merchandise. *Id.* at 1362.

Having selected Malaysia as the surrogate country, Commerce turned to the matter of surrogate financial rates. The relevance of this item is that, once Commerce identifies surrogate values for factors of production, "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses" is added to calculate normal value. 19 U.S.C. § 1677b(c)(1)(B); *see also Dorbest Ltd. v. United States*, 604 F.3d 1363, 1368 (Fed. Cir. 2010). Commerce values expenses "by using financial ratios derived from financial statements of producers of comparable merchandise in the surrogate country." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d

1316, 1319–20 (Fed. Cir. 2010) (citing *Dorbest*, 604 F.3d at 1368).

Commerce had before it the financial statements of four companies. Two financial statements were from Malaysian producers of activated carbon, Century Chemical Works Sdn. Bhd. ("Century") and Bravo Green Sdn. Bhd. ("Bravo Green"). *Carbon Activated*, 650 F. Supp. 3d at 1362. The record also contained financial statements from S.C. Romcarbon S.A. ("Romcarbon"), a Romanian producer of polyethylene, polypropylene, polyvinyl chloride, polystyrene processing, filters, and protective materials, and financial statements from Joint Stock Company Sorbent ("JSC Sorbent"), a Russian producer of respiratory protection products and activated carbon. *Id.*

In the *Final Results*, Commerce determined that the Century and Bravo Green financial statements were the best available information for the purpose of calculating surrogate financial ratios. First, Commerce determined that, while Century and Bravo Green's principal business activity was the manufacture and sale of activated carbon, Romcarbon's financial statements indicated that its principal business activity was unrelated to the manufacture or sale of activated carbon, while it was difficult to ascertain what portion of JSC Sorbent's portfolio related to the production of activated carbon and what portion related to other business activities. *Carbon Activated*, 650 F. Supp. 3d at 1362. Finally, Commerce explained that, having found Malaysia to be the primary surrogate country, Century and Bravo Green's financial statements were preferable because of Commerce's preference for valuing all factors of production in one surrogate country, and Malaysia was the only country that provided multiple usable financial statements. *Id.*

Next, Commerce valued four factors of production used by Carbon Activated in producing activated carbon: coal-

based carbonized material; coal tar; hydrochloric acid; and steam.

For the *Final Results*, Commerce valued coal-based carbonized material using Malaysian data under Harmonized Tariff Schedule ("HTS") 4402.90.1000, which covers "coconut shell charcoal." *Carbon Activated*, 650 F. Supp. 3d at 1365. To value coal tar, Commerce used Malaysian data under HTS subheading 2706.00, which covers "Mineral Tars, Including Reconstituted Tars." *Id.* at 1367. To arrive at a value for hydrochloric acid, Commerce turned to Malaysian data for HTS 2806.10, which covers "hydrogen chloride (hydrochloric acid)." *Id.* at 1369. Finally, Commerce valued steam using Malaysian data for HTS 2711.11, which covers liquified natural gas. *Id.* at 1371.

The final matter relevant to this appeal is valuation of the expense of ocean freight. The administrative record contained two sets of data, one from the Danish shipping company Maersk and the other from Descartes Systems Group Inc. ("Descartes"). In the *Final Results*, Commerce selected the Maersk data. *Carbon Activated*, 650 F. Supp. 3d at 1372. As noted, the Trade Court sustained the *Final Results*, and this appeal followed.

## III

We review decisions of the Trade Court concerning Commerce's antidumping determinations by applying the same standard of review used by the Trade Court. *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1377 (Fed. Cir. 2013). "Commerce's determination will be sustained unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Id.* (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

IV

On appeal Carbon Activated challenges each of the determinations noted above. We address its contentions in turn.

A.  Surrogate Financial Ratios

Carbon Activated begins by challenging Commerce's selection of Malaysia as the primary surrogate country. It argues that Commerce erred because, in selecting Malaysia, it relied solely on the "net exporter" criterion in the Policy Bulletin. According to Carbon Activated, by following this erroneous approach, Commerce "shielded itself from having to consider the on-record (and superior) financial statements of Romanian producer Romcarbon." Appellants' Br. 13–14. Carbon Activated urges that Commerce thus ran afoul of the requirement of both the Policy Bulletin and 19 U.S.C. § 1677b(c)(1)(B) that the selection of a surrogate country be based upon the "best available information." *Id.* at 14–15. Carbon Activated thus argues that Commerce erred in not considering Romcarbon's financial statements when it made its surrogate country selection of Malaysia over Romania. Appellants' Br. 15–16.

We do not agree. We have recognized Commerce's reliance on the Policy Bulletin, *Jiaxing*, 822 F.3d at 1294 n.3, and Carbon Activated does not challenge that reliance. In accordance with the Policy Bulletin, Commerce determined that Malaysia was a net exporter of activated carbon because it exported more of the product than it imported. App. 7919–20 & nn. 217, 221. That determination is supported by substantial evidence. In addition, Commerce's significant-producer determination was supported by the financial statements on the record. Commerce found that only the Malaysian financial statements provided evidence of significant production of activated carbon in terms of both quantity and value. App. 7920 & n.222 (citing App. 3708–90). We see no error in Commerce's reliance on the net exporter criterion of the Policy Bulletin.

Carbon Activated also challenges Commerce's reliance on the financial statements of Century and Bravo Green. Carbon Activated argues that the Century and Bravo Green financial statements, which did not disaggregate the costs of labor, raw materials, and energy, were less reliable than those of Romcarbon and JSC Sorbent. Appellants' Br. 26–31. Commerce acknowledged that the Century and Bravo Green financial statements were "not as detailed" as it preferred. App. 7921. It explained, however, that the financial statements still "provide[d] sufficient information to calculate surrogate ratios for factory overhead costs, [selling, general, and administrative] expenses, and profit." *Id.* Moreover, as noted above, Commerce analyzed the contents of both Romcarbon's and JSC Sorbent's statements and found that the principal activities of both companies were dissimilar to the production of activated carbon, unlike the Malaysian producers. App. 7920. "Commerce has broad discretion to determine what constitutes the best available information, as this term is not defined by statute." *Qingdao Sea-Line Trading Co., Ltd. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014). The test "is not whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Jiaxing*, 822 F.3d at 1300–01; *see also Downhole Pipe & Equip., L.P. v. United States,* 776 F.3d 1369, 1379 (Fed. Cir. 2015). Under this standard, based upon the evidence it had before it, we see no error in Commerce's selection of the financial statements of Century and Bravo Green over those of Romcarbon and JSC Sorbent. Thus, the Trade Court did not err in sustaining Commerce's selection of surrogate financial ratios. We consider next Carbon Activated's arguments with respect to the four factors of production noted above.

## B. Valuation of Carbonized Material

Carbon Activated argues that Commerce's decision to value carbonized material using Malaysian import data for

coconut shell charcoal classified under HTS subheading 4402.90.1000 was not supported by substantial evidence. Specifically, it claims that the data that Commerce selected was not contemporaneous with the period of review and that it was not an appropriate basis for valuing the coal-based carbonized material that Carbon Activated asserts it actually used. Appellants' Br. 34–43.

Relevant to the first point, in valuing carbonized material, Commerce used data from the immediately preceding twelfth administrative review, that it adjusted for inflation, to determine the value that it used in AR13. App. 7927; App. 6914. Carbon Activated argues that this approach was contrary to the Policy Bulletin, which states, in relevant part, that "it is the Department's stated practice to use . . . prices that are contemporaneous with the period of . . . review." We see no error in this case, however, in Commerce's use of adjusted data from the twelfth administrative review. Whether surrogate values are contemporaneous with the period of review is one of the factors that Commerce considers when selecting the best available information, but it is not a dispositive factor and, thus, Commerce has discretion to select non-contemporaneous data. *See Qingdao*, 766 F.3d at 1386. Commerce properly exercised that discretion here. Commerce explained that, while the data it selected was non-contemporaneous with the period of review in AR13, it "favor[ed] specificity over contemporaneity" in the review based on its finding that HTS 4402.90.1000 was the most appropriate proxy to value the carbonized material used by Carbon Activated. App. 7927; *see also Carbon Activated*, 650 F. Supp. 3d at 1366.

Carbon Activated's second argument with respect to the valuation of carbonized material is that the surrogate value for carbonized material upon which Commerce relied is deficient because coconut shell charcoal is distinct from Carbon Activated's coal-based carbonized material and is dissimilar to surrogate information concerning wood-based charcoal used by Commerce in prior reviews. Appellants'

Br. 36–43.  We agree with the Trade Court's rejection of Carbon Activated's argument on this point.  The court determined that Commerce provided "a reasoned explanation as to why coconut shell charcoal was a more appropriate proxy for the coal-based carbonized material used by [Carbon Activated] than wood charcoal." *Carbon Activated*, 650 F. Supp. 3d at 1366 (citing App. 7925–26).  As the court explained:

> First, the record indicates that "both coconut shell- and coal-based carbonized material are steam acti-vated[,] whereas wood-based carbonized material is generally chemically activated," impacting "the ultimate physical structure of the carbonized ma-terial."  Second, the record showed that coconut shell- and coal-based carbonized materials had a different level of filtration than wood-based acti-vated carbon.

*Id.* (internal citations omitted) (quoting App. 7925).

## C.  Valuation of Coal Tar

As noted, in the *Final Results*, Commerce valued coal tar using Malaysian HTS subheading 2706.00 import data.  This subheading covers "Mineral Tars, Including Reconsti-tuted Tars." *Carbon Activated*, 650 F. Supp. 3d at 1367; *see* App. 7913.  Carbon Activated makes two main arguments as to why Commerce's determination is not supported by substantial evidence.  It first argues that the surrogate in-formation relied on by Commerce is distorted because the Malaysian values for merchandise classified under HTS subheading 2706.00 are higher than those classified under HTS subheading 2708.10 for "pitch," a downstream prod-uct that should therefore reflect higher values than coal tar.  Appellants' Br. 44–45.  The Trade Court rejected this argument because Carbon Activated "did not provide evi-dence to support [its] inference that the higher value-added product necessarily should be priced higher on the same

per weight basis." 650 F. Supp. 3d at 1368.  We see no error in this ruling.

Carbon Activated's second main argument on this point is that Malaysian coal tar import data is unreliable due to the "[s]tark disparities . . . between the domestic market and Malaysian import prices for both Malaysia and Spain." Appellants' Br. 45; *see also id.* at 44–46.  The Trade Court rejected this argument on the ground that Carbon Activated "failed to provide evidentiary support for [its] assertion that the Spanish data [was] aberrant." *Carbon Activated*, 650 F. Supp. 3d at 1368.  Again, we see no error in this ruling.

### D. Valuation of Hydrochloric Acid

Commerce valued hydrochloric acid under Malaysian import data for HTS 2806.10, which covers "hydrogen chloride (hydrochloric acid)." *Carbon Activated*, 650 F. Supp. 3d at 1369.  This is a basket category that covers both anhydrous hydrogen chloride (without added water) and aqueous hydrochloric acid (with added water). *Id.*

Carbon Activated argues that, because the subheading 2806.10 covers both forms of hydrochloric acid, the Malaysian import data Commerce used to value hydrochloric acid is not specific to the diluted aqueous hydrochloric acid it uses. Appellants' Br. 48–50.  Instead, Carbon Activated asserts, Commerce should have relied on Brazilian import data for merchandise classified under HTS subheading 2806.10.20 for aqueous hydrochloric acid. *Id.* at 50–52.

We are not persuaded by either argument.  Before the Trade Court, Commerce argued, and the court agreed, that Carbon Activated failed to demonstrate with substantial evidence the aqueous nature of all of its hydrochloric acid inputs. *Carbon Activated*, 650 F. Supp. 3d at 1370–71. We see no reason to disturb that finding and thus see no merit in Carbon Activated's arguments that Commerce should have used a more specific subheading or more specific data.

### E. Valuation of Steam

Carbon Activated next argues that Commerce improperly valued steam by relying on the Malaysian import value for liquified natural gas, classified under HTS subheading 2711.11, because it "is not specific to steam." Appellants' Br. 52–53. It argues that, instead, Commerce should have relied on the value of merchandise classified under HTS subheading 2711.21, the provision that covers natural gas in a gaseous state. *Id.* at 55.

Before the Trade Court, Commerce argued that Malaysian import data for liquified natural gas was the best available information in the record to value steam because this data was publicly available and from the primary surrogate country. Carbon Activated responded to this argument by contending that Commerce failed to explain how the use of liquified natural gas explained the costs incurred by Carbon Activated when Carbon Activated did not use a liquid to produce steam, but rather natural gas in a gaseous state. *Carbon Activated*, 650 F. Supp. 3d at 1371–72. Carbon Activated also contended that domestic gaseous natural gas prices in Malaysia during the period of review were significantly lower than the import data used to value its steam. *Id.*

In sustaining Commerce's decision, the Trade Court noted that, in the twelfth administrative review, it had rejected the argument that Commerce may not select liquified natural gas as a surrogate because it is not specific to steam, noting that "the energy source input need not be in the same phase (solid, liquid, gaseous) as the steam the energy creates." *Id.* at 1372 (quoting *Carbon Activated Tianjin Co. v. United States*, 586 F. Supp. 3d 1360, 1377 (Ct. Int'l Trade 2022)). In addition, the court noted that Commerce had explained that the domestic natural gas prices identified by Carbon Activated were unreliable and did not represent the best available information. *Id.* On appeal,

Carbon Activated has failed to demonstrate any error in the Trade Court's reasoning on this point.

## F.  Valuation of Ocean Freight

The final issue before us is Commerce's valuation of ocean freight.  As noted, Commerce valued ocean freight on the basis of Maersk freight data rather than Descartes data.  *Carbon Activated*, 650 F. Supp. 3d at 1372.  Commerce determined that the data from Maersk represented the best available information to value freight expenses because that data represented freight tariffs covering the entire period of review and various routings.  App. 7929.  The Trade Court sustained Commerce's determination.  It concluded that Commerce's decision was supported by substantial evidence.  First, it found that Carbon Activated had not provided any evidence undermining Commerce's determination that the Maersk data represented actual tariff rates and not approximations.  *Carbon Activated*, 650 F. Supp. 3d at 1373.  And second, it concluded that, even if the flaws in the Maersk data alleged by Carbon Activated existed, Carbon Activated had failed to show that the Descartes data was the best available information with which to value ocean freight.  Significantly, the court stated that Carbon Activated had not provided "any evidence to support its contention that the Descartes data represents actual transactions."  *Id.*  We have considered all of the arguments made by Carbon Activated on this point.  None of them has convinced us that the Trade Court erred in concluding that Commerce's decision with respect to freight charges was supported by substantial evidence and was free of legal error.

CONCLUSION

For the foregoing reasons, we affirm the decision of the Trade Court sustaining Commerce's *Final Results* in AR13.[3]

**AFFIRMED**

---

[3]    We have considered the additional arguments raised by Carbon Activated with respect to each issue discussed above and have found them to be unpersuasive.