# United States Court of Appeals for the Federal Circuit

---

**AD HOC SHRIMP TRADE ACTION COMMITTEE,**
*Plaintiff-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellee,*

**and**

**GROBEST & I-MEI INDUSTRIAL (VIETNAM) CO., LTD.,**
*Defendant-Appellee.*

---

2010-1027

---

Appeal from the United States Court of International Trade in case no. 07-CV-0380, Judge Thomas J. Aquilino, Jr.

---

Decided: September 8, 2010

---

KEVIN M. O'CONNOR, Picard, Kentz & Rowe LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief were NATHANIEL RICKARD, ANDREW W. WENTZ, and DAVID A. YOCIS.

STEPHEN C. TOSINI, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee United States. With him on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and PATRICIA M. MCCARTHY, Assistant Director.

MATTHEW R. NICELY, Thompson Hine LLP, of Washington, DC, argued for defendant-appellee Grobest & I-Mei Industrial (Vietnam) Co., Ltd. With him on the brief was CHRISTOPHER M. RASSI.

---

Before RADER, *Chief Judge*, BRYSON and DYK, *Circuit Judges*.

RADER, *Chief Judge*.

The Court of International Trade denied Ad Hoc Shrimp Trade Action Committee's ("Ad Hoc") motion for judgment upon the agency record following the first administrative review of an antidumping duty order covering certain frozen warmwater shrimp from the Socialist Republic of Vietnam. *Ad Hoc Shrimp Trade Action Comm. v. United States*, 31 I.T.R.D. (BNA) 1855 (Ct. Int'l Trade 2009). Because the Court of International Trade should have affirmed the U.S. Department of Commerce's ("Commerce") decision on the merits, this court reverses the decision to dismiss and remands with instructions to enter judgment against Ad Hoc.

I

Commerce imposes antidumping duty orders upon imported merchandise that is sold in the United States below its fair value and materially injures or threatens to

injure a domestic industry. *See* 19 U.S.C. § 1673 (2006). An antidumping duty reflects the amount by which the normal value exceeds the export price of the merchandise. 19 U.S.C. § 1673e(a)(1); 19 U.S.C. § 1677(35). The normal value is the price of the merchandise when sold for consumption in the exporting country. 19 U.S.C. § 1677b(a)(1). The normal value may not reflect the fair value of the merchandise when the exporting country does not operate on market principles of cost or pricing structures. *See* 19 U.S.C. § 1677(18)(A). Therefore, when the exporting country has a nonmarket economy, Commerce must devise a constructed normal value:

> [Commerce] determine[s] the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses. . . . [T]he valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce].

19 U.S.C. § 1677b(c)(1). Commerce values certain factors of production, such as selling, general, and administrative expenses, factory overhead, and profit, by using financial ratios derived from financial statements of producers of comparable merchandise in the surrogate country. *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1368 (Fed. Cir. 2010). Generally, if more than one producer's financial statements are available, Commerce averages the financial ratios derived from all the available financial statements. *Id.* The statute "accords Commerce wide discretion in the valuation of factors of production."

*Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999).

## II

In 2005, Commerce imposed antidumping duties on certain frozen warmwater shrimp from the Socialist Republic of Vietnam. *Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam*, 70 Fed. Reg. 5152 (Feb. 1, 2005). In 2007, Commerce published the final results of its first administrative review of the antidumping duty order, covering entries from July 16, 2004, to January 31, 2006. *See Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Final Results of the First Antidumping Duty Administrative Review and First New Shipper Review*, 72 Fed. Reg. 52,052 (Sept. 12, 2007) ("Final Results"). Because the Socialist Republic of Vietnam has a nonmarket economy, Commerce selected Bangladesh as the surrogate country. Commerce used Bangladeshi shrimp market data as reported by the Network of Aquiculture Centres in Asia-Pacific ("NACA Survey data") to calculate the normal value of the imported shrimp. Although both parties had agreed that the market data from Apex Foods Ltd. ("Apex"), one of the largest Bangladeshi shrimp processors, were reliable, Commerce selected the NACA Survey data over the Apex data.

In addition, Commerce calculated the surrogate financial ratios based on the financial statements of two Bangladeshi shrimp processors, Apex and Gemini Seafood Ltd. Commerce excluded the financial statements of Bionic Seafood Exports Ltd. ("Bionic") because Bionic earned no profit during the period of review. In the Final Results, Commerce also acknowledged that its practice of using unprofitable companies' financial statements had been inconsistent in prior administrative reviews of

antidumping duty orders. It therefore clarified its intention to disregard financial ratios of unprofitable companies when there are financial statements of other surrogate companies that have earned a positive profit on the record. Commerce ultimately assigned a zero anti-dumping margin to the sole mandatory respondent in the administrative review, Vietnam Fish One Co., Ltd.

On October 13, 2007, Ad Hoc, a committee of domestic producers and processors of warmwater shrimp, filed a complaint in the Court of International Trade challenging two aspects of the final result: (1) the decision to value shrimp based on the surrogate value from the NACA Survey data rather than from the Apex data; and (2) the decision to exclude Bionic's financial statements in calcu-lating the surrogate financial ratios. On January 11, 2008, Grobest & I-Mei Industrial (Vietnam) Co., Ltd. ("Grobest"), a party to an accompanying shipper review, intervened as a defendant. On April 24, 2008, Ad Hoc filed a motion for judgment upon the agency record.

On August 12, 2009, the Court of International Trade denied the motion and dismissed the action without reaching the merits of Ad Hoc's claims. Ad Hoc had been granted leave to intervene in a judicial review of the second administrative review of the underlying antidump-ing duty order (covering entries from February 1, 2006 to January 31, 2007) in which Ad Hoc again challenged Commerce's reliance on the NACA Survey data. In dis-missing the present action without reaching the merits, the trial court stated that "it seems safe to assume that that [the NACA Survey data] issue will entail multipar-tite litigation in the [later] consolidated case." *Ad Hoc Shrimp Trade Action Comm.*, 31 I.T.R.D. (BNA) 1855. The trial court did not address Ad Hoc's claim regarding the exclusion of Bionic's financial statements. Ad Hoc

appeals the decision to dismiss the case. This court has jurisdiction under 28 U.S.C. § 1295(a)(5).

## III

### A

This court reviews Commerce's antidumping decisions using the same standard of review used by the Court of International Trade. *Ningbo*, 580 F.3d at 1254. This court upholds Commerce's decisions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Id.*; 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is more than a mere scintilla and such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ningbo*, 580 F.3d at 1254 (internal quotation marks omitted).

### B

"Questions may occur which we would gladly avoid; but we cannot avoid them. All we can do is, to exercise our best judgment, and conscientiously to perform our duty." *Cohens v. Virginia*, 19 U.S. 264, 404 (1821). Federal courts do not have the authority to decline to exercise jurisdiction conferred by the statute. *See New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 358 (1989) ("[F]ederal courts lack the authority to abstain from the exercise of jurisdiction that has been conferred[.]"). The Court of International Trade, just like any other federal court, must address the issues within its jurisdiction. Specifically, the Court of International Trade "has expertise in addressing antidumping issues and deals on a daily basis with the practical aspects of trade practice." *Int'l Trading Co. v. United States*, 281 F.3d 1268, 1274 (Fed. Cir. 2002). The trial court must therefore use its expertise to resolve the parties' disputes

regardless of any complications or time-consuming processes.

Specifically, the Court of International Trade cannot dismiss a complaint merely because one of the issues raised in the complaint is also present in a subsequent administrative review of the same antidumping duty order and could be addressed in judicial review of that proceeding. Each administrative review covers a different period of time and different product entries. Therefore, the trial court incorrectly assumed that the later litigation regarding the second administrative review will provide Ad Hoc with relief relating to the first administrative review. By dismissing the complaint, the trial court did not provide a decision on the merits of Ad Hoc's claims.

C

This court declines to remand the case to the Court of International Trade to decide the case on the merits. This court's review of the Court of International Trade's decision is plenary and the merits decision must be made on the basis of Commerce's record. *See Ningbo*, 580 F.3d at 1254. Here, the agency record is extensive and includes comprehensive briefing on the merits of all disputed issues. Likewise, on appeal to this court, the parties extensively argued the merits of Ad Hoc's two claims. For the reasons discussed below, the Court of International Trade would have no basis on remand for doing anything other than accepting Commerce's decision. Remanding the case would unnecessarily prolong the litigation and uncertainty in the marketplace. Although this court usually gives "great weight to the informed opinion of the [Court of International Trade], and it is nearly always the starting point of our analysis," *Ningbo*, 580 F.3d at 1253, in the interest of judicial economy, this court will exercise

its duty of reviewing this case on the exact same record with the exact same legal standards that govern the trial court. This court will address the merits of this case at this juncture on appeal.

Commerce has broad discretion to determine the best available information for an antidumping review. *See Nation Ford Chem.*, 166 F.3d at 1377. Commerce found the NACA Survey data to be "the best available information" because it presented "a broad market average, specific to the input in question, exactly contemporaneous with the [period of review], and reliable." (J.A. 45). The NACA Survey data drew data from actual records of sales maintained by nearly 200 Bangladeshi shrimp industry stakeholders, including eight shrimp processors from five major shrimp producing districts of Bangladesh. The NACA Survey data included Rupsha Fish and Allied Co., Ltd., which are two of the largest Bangladeshi shrimp exporters to the United States. The NACA Survey corroborated the collected sales data with general price information obtained from the Bangladeshi Department of Fisheries and another exporter. Although Ad Hoc criticizes that data as unaudited, no statute or regulation requires Commerce to use audited data in calculating the surrogate values. In any event, NACA relied on actual transaction data and validated the general accuracy of the collected data with independent sources. Thus, Commerce had ample reason to rely on the accuracy and comprehensiveness of the NACA Survey data.

Ad Hoc argues that the NACA Survey data is incomplete because it lacks specific price information for two of the ten shrimp sizes examined in the review. Commerce accounted for these two sizes by averaging percentage decreases in value for the other eight sizes to extrapolate the values for the two sizes at issue. The Court of International Trade has previously sustained Commerce's

determinations based on extrapolations drawn from reliable data. *See Zhejiang Native Produce & Animal By-Products Imp. & Exp. Grp. v. United States*, 2008 WL 2410210, at *9 (Ct. Int'l Trade June 16, 2008). Ad Hoc provides no reason to distrust this extrapolation method in this case.

The NACA Survey data contains a broad market average of product-specific data that are contemporaneous with the period of review. Commerce has explained that it "prefers, whenever possible, to use countrywide data, and only resorts to company-specific (or regional) information when countrywide data are not available." (J.A. 44). In accordance with its policy, Commerce chose the NACA Survey data over the Apex data, which is specific to one company. Commerce's policy on using countrywide data, whenever available, is reasonable, as such data gives a broad overview of the relevant market. Ad Hoc does not identify any reasoning or evidence to support its contention that the NACA Survey data is unreliable or incomplete. For this reason, substantial evidence supports Commerce's finding that the NACA Survey data presented the best available information.

Commerce also excluded Bionic's financial statements from the calculation of the surrogate financial ratios because Bionic did not make any profit during the period of review. Commerce has always disregarded unprofitable companies' profits in calculating the average profit amount in the surrogate market. However, Commerce has inconsistently used the same companies' expenses in calculating the average overhead and selling, general, and administrative expenses. In the present review, Commerce articulated its preference for profitable companies' financial statements for determining both surrogate amounts of profits and expenses. Commerce reasoned that using unprofitable companies' financial

statements to calculate expenses does "not account for the interconnectedness of the overhead and [selling, general, and administrative expenses] with the zero profit." (J.A. 50). A company's profit amount is a function of its total expenses and thus, is intrinsically tied to the company's expenses and its financial ratio. Commerce therefore reasonably preferred to use financial statements from profitable companies when available. Substantial evidence supports Commerce's decision to exclude Bionic's financial statements in calculating the surrogate financial ratios, in favor of using financial statements from the two profitable surrogate companies.

## IV

The Court of International Trade erred by dismissing the case without reaching the merits of Ad Hoc's claims. Substantial evidence supports Commerce's decisions to calculate the surrogate shrimp value based on the NACA Survey data and to exclude Bionic's financial statements in calculating the surrogate expenses. Accordingly, this court reverses the trial court's decision to dismiss the action and remands with instructions to enter judgment against Ad Hoc.

### REVERSED AND REMANDED

#### COSTS

Costs to Ad Hoc.