# United States Court of Appeals for the Federal Circuit

---

**RISEN ENERGY CO., LTD.,**
*Plaintiff-Appellant*

**TRINA SOLAR CO., LTD., ET AL.,**
*Plaintiffs*

**CANADIAN SOLAR INC., CANADIAN SOLAR INTERNATIONAL LIMITED, CANADIAN SOLAR MANUFACTURING (CHANGSHU), INC., CANADIAN SOLAR MANUFACTURING (LUOYANG), INC., CSI CELLS CO., LTD., CANADIAN SOLAR (USA), INC.,**
*Plaintiffs-Appellees*

**v.**

**UNITED STATES**
*Defendant-Appellee*

**SUNPOWER MANUFACTURING OREGON, LLC,**
*Defendant*

---

2023-1550

---

Appeal from the United States Court of International Trade in No. 1:20-cv-03743-CRK, Judge Claire R. Kelly.

---

Decided:  December 9, 2024

---

ALEXANDRA H. SALZMAN, DeKieffer & Horgan, PLLC, Washington, DC, argued for plaintiff-appellant. Also represented by JAMES KEVIN HORGAN, GREGORY S. MENEGAZ.

ASHLEY AKERS, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by REGINALD THOMAS BLADES, JR., BRIAN M. BOYNTON, PATRICIA M. MCCARTHY; BRISHAILAH BROWN, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

JONATHAN STOEL, Hogan Lovells US LLP, for plaintiffs-appellees. Also represented by LINDSAY BROWN, CRAIG A. LEWIS, NICHOLAS SPARKS.

_____

Before DYK, STOLL, and STARK, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* DYK.

Opinion concurring-in-part and dissenting-in-part filed by *Circuit Judge* STARK.

DYK, *Circuit Judge*.

This appeal concerns the Sixth Administrative Review of an antidumping order concerning crystalline silicon photovoltaic cells (commonly referred to as "solar cells") from the People's Republic of China.

Appellant Risen Energy Co., Ltd. ("Risen") is a Chinese exporter of solar cells, whose products are subject to the antidumping order imposed by the Department of Commerce ("Commerce"). Risen was selected as a mandatory respondent for such review. Since China is a nonmarket economy to calculate a dumping margin,

Commerce used surrogate values from Malaysia for computing normal values (home market price) for the Sixth Administrative Review. The Court of International Trade ("Trade Court") sustained Commerce's surrogate value calculations for Risen's physical inputs and its surrogate financial ratio calculations. *See Risen Energy Co. v. United States*, 569 F. Supp. 3d 1315, 1326 (Ct. Int'l Trade 2022) (*Risen I*); *Risen Energy Co. v. United States*, 611 F. Supp. 3d 1384, 1389–94 (Ct. Int'l Trade 2022) (*Risen II*). Risen appeals, challenging Commerce's surrogate value calculations for its backsheet and ethyl vinyl acetate ("EVA"), and Commerce's overhead ratio calculation. Because Commerce's selections of surrogate values for Risen's backsheet and EVA inputs were supported by substantial evidence, but Commerce's surrogate overhead ratio calculation was not, we affirm in part, vacate in part, and remand.

BACKGROUND

I

The government imposes antidumping duties on foreign merchandise sold "in the United States at less than its fair value." *Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318, 1321 (Fed. Cir. 2020) (quoting 19 U.S.C. § 1673(1)). To determine the duties, Commerce calculates a "dumping margin" for each entry of merchandise subject to review. 19 U.S.C. § 1675(a)(2)(A)(ii). A dumping margin is "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise." *Id.* § 1677(35)(A).

"Normal value" generally will be "the price at which the foreign like product is first sold . . . for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price[.]" *Id.* § 1677b(a)(1)(B)(i).

However, if it is determined that "the subject merchandise is exported from a nonmarket economy" (such as China), and "available information does not permit the normal value of the subject merchandise to be determined" using the price of the product as first sold in the originating country, Commerce must calculate normal value by valuing the "factors of production utilized in producing the merchandise" in a comparable "market economy country or countries." *Id.* § 1677b(c)(1).

The factors of production that Commerce must value include, but are not limited to, "hours of labor required, quantities of raw materials employed, amounts of energy and other utilities consumed, and representative capital cost, including depreciation." *Id.* § 1677b(c)(3). Once Commerce identifies surrogate values for these factors of production, "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses" is added to calculate normal value. *Id.* § 1677b(c)(1)(B). Commerce values these expenses "by using financial ratios derived from financial statements of producers of comparable merchandise in the surrogate country." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1319 (Fed. Cir. 2010).

By identifying a surrogate country and surrogate values for the factors of production, Commerce approximates "what a non-market economy manufacturer might pay in a market economy setting." *Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001).

II

In March 2019, Commerce initiated this Sixth Administrative Review of an earlier antidumping order covering solar cells from China for a period of review from December 1, 2017, through November 30, 2018. *See* Initiation of Antidumping Duty and Countervailing Duty Administrative Reviews, 84 Fed. Reg. 9300 (Dep't of Com.

Mar. 14, 2019). Risen was selected as a mandatory respondent. *See* Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results, 85 Fed. Reg. 7532 (Dep't of Com. Feb. 10, 2020); *see also* 19 U.S.C. § 1677f-1(c)(2); 19 C.F.R. § 351.204(c)(2).[1]

China is a nonmarket economy, so Commerce was required to select a primary surrogate country and individual surrogate values for Risen's various inputs. *See* 19 U.S.C. § 1677b(c).

In October 2020, Commerce published the final results of its administrative review. *See* Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results, 85 Fed. Reg. 62,275 (Dep't of Com. Oct. 2, 2020). Commerce selected Malaysia as the primary surrogate country, and it used import data from certain of the Malaysia Harmonized Tariff Schedule ("HTS") categories applicable to "plates and sheets" to value Risen's backsheet and EVA inputs,[2] rejecting Risen's position that Commerce should use the import data related to the HTS categories that apply to "film" instead. Commerce additionally used the 2018 financial statement from Malaysian solar cell producer Hanwha Q Cells Malaysia to calculate surrogate financial ratios, including overhead. Risen filed suit in the Trade Court, arguing that Commerce's determinations

---

[1]   Trina Solar Co., Ltd. ("Trina") was also selected as a mandatory respondent and participated in the litigation below by challenging certain of Commerce's determinations. Trina did not join in Risen's appeal.

[2]   Backsheet is a flexible plastic product used to protect the back of solar cells from water, sunlight, corrosion, and other environmental factors. EVA is a flexible plastic product used to encapsulate solar cells and protect them from ultraviolet aging and weathering.

were not supported by substantial evidence. *See Risen I*, 569 F. Supp. 3d at 1320.

The Trade Court initially agreed with Risen that Commerce's valuations of its backsheet and EVA inputs under the HTS categories it chose were "not supported by substantial evidence." *Id.* at 1327, 1331–32. The Trade Court agreed that Commerce had selected different HTS categories to value Risen's backsheet and EVA in a prior administrative review, and Commerce had not adequately explained its reasons for its change in practice. *Id.* at 1331–32. The Trade Court remanded the matter to Commerce for the agency to further "explain its departure from its historical treatment" of those inputs. *Id.* at 1332.

However, the Trade Court sustained Commerce's surrogate financial ratio calculation for overhead, despite its reservations about Commerce's rationale, finding "Commerce's reasoning could be clearer." *Id.* at 1332. Nonetheless, the court could "reasonably discern from Commerce's citation" to two notes within the 2018 Hanwha financial statement that Commerce's allocation methodology was compliant with a standard in the International Financial Reporting Standards ("IFRS") applicable to inventories. *Id.* at 1333–34.

On remand, Commerce reopened the record to further substantiate its choice of HTS categories for Risen's backsheet and EVA inputs. *See Risen II*, 611 F. Supp. 3d at 1391–93. Commerce placed on the record abstracts from two standards of the American Society for Testing and Materials ("ASTM"), ASTM D4801 and ASTM D6988, relating to film and sheet. *See id.* at 1392–93. Commerce continued to value Risen's backsheet and EVA with the HTS categories applicable to "sheet," as opposed to the "film" categories Risen wanted, because in Commerce's view, the ASTM standards define "sheet" as materials with a thickness greater than 0.25 mm, and both of Risen's inputs meet that definition. The Trade Court sustained

Commerce's remand determinations, concluding that they were reasonable in light of the new definition provided by the ASTM standards. *See id.* at 1392–94.

Risen appeals. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## DISCUSSION

We review Commerce's determinations using the same standard as the Trade Court—that is, whether those determinations are "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i); *see Changzhou Trina Solar Energy*, 975 F.3d at 1325.

## I

We first address the issue of Commerce's classification of Risen's backsheet and EVA inputs under the Malaysia HTS categories applicable to "sheet" instead of "film."

In assessing factors of production, Commerce is obligated to use the "best available information" from the surrogate country to identify an exporter's inputs and assign surrogate values to them. *See Shakeproof Assembly Components*, 268 F.3d at 1381 (quoting 19 U.S.C. § 1677b(c)(1)). Commerce "has broad discretion" to determine what information meets that standard because the tariff statute does not define what constitutes the "best available information." *Changzhou Trina Solar Energy*, 975 F.3d at 1331 (quoting *QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011)). In general, Commerce will select, "to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review." *Id.* (quoting *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014)).

Commerce frequently uses import data from HTS categories as the "best available information" to calculate a specific surrogate price by weight (or unit) for the input under the HTS category chosen. *See, e.g.*, *id.* at 1332–33 (holding that Commerce's "decision to value Trina's module glass using Thai imports of tempered glass classified under HTS Subheading 7007.19.900000" was supported by substantial evidence). In doing so, Commerce seeks to select the HTS category that most precisely corresponds to the particular input. *See SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216, 1223 (Fed. Cir. 2018).

Risen agrees that valuation using import data from HTS categories is appropriate but objects to Commerce's choice of HTS "sheet" categories for its backsheet and EVA inputs, arguing that Commerce could not reasonably rely upon the ASTM standards because those standards do not bear a "reasonable relationship to the inputs in question or defin[e] film and sheet." Appellant Br. 16. Instead, Risen argues, Commerce should have used the product specifications and marketing materials Risen placed on the record to select HTS categories. We disagree.

We have recognized that, under the statute, industry standards are highly relevant to determining what merchandise is subject to an antidumping duty order. For example, in *ArcelorMittal Stainless Belgium N.V. v. United States*, 694 F.3d 82 (Fed. Cir. 2012), we stated that "[b]ecause the primary purpose of an antidumping order is to place foreign exporters on notice of what merchandise is subject to duties, the terms of an order should be consistent, to the extent possible, with trade usage." *Id.* at 88. More recently, in *Saha Thai Steel Pipe Public Co. v. United States*, 101 F.4th 1310 (Fed. Cir. 2024), we affirmed Commerce's scope ruling in part because the fact that the exporter's merchandise was certified "in compliance with ASTM specifications" supported Commerce's reading of the plain language of the order to include the exporter's products. *Id.* at 1327. Moreover, Commerce's regulations

specifically direct the agency to consult industry standards where the scope of an antidumping duty order is ambiguous. *See* 19 C.F.R. § 351.225(k). Given this practice, it was not unreasonable for Commerce to seek guidance from a familiar source—industry standards—to inform its choice of which HTS categories best apply to Risen's inputs.

The first standard relied upon by Commerce, ASTM D6988, is titled "Standard Guide for Determination of Thickness of Plastic Film Test Specimens," and "covers the determination of the thickness of plastic films where the thickness is used directly in determining the results of tests for various properties." J.A. 7417–18. The standard defines "film" as an "optional term for sheeting having a nominal thickness no greater than 0.25 mm[.]" J.A. 7418. The second standard, ASTM D4801, is titled "Standard Specification for Polyethylene Sheeting in Thickness of 0.25 mm (0.010 in.) and Greater," and "covers the requirements for extruded (cast or blown) and compression-molded sheeting made from low-, medium-, and high-density polyethylenes and copolymers[.]" J.A. 7421–22. Taken together, Commerce understood these standards as setting forth a distinction between polyethylene "sheet" and "film," which turned on the thickness of the material. The fact that the thickness of Risen's backsheet and EVA inputs fell within the "sheet" definition (and not the "film" definition) led Commerce to conclude that those inputs were more appropriately categorized under the HTS categories for "sheet" rather than "film."

Commerce's choices of the HTS categories applicable to "sheet" for Risen's backsheet and EVA inputs were supported by substantial evidence and not otherwise contrary to law.

Risen's arguments to the contrary are not persuasive. First, we reject Risen's argument that the ASTM standards

should be disregarded because they do not mention Risen's inputs or the solar industry more generally. The standards cited by Commerce are not limited to particular products and appear to cover a broad array of plastic materials. Risen offers no alternative industry standards, and we conclude that it was reasonable for Commerce to determine that the industry standards it introduced constituted the best available information to distinguish between "sheet" and "film."

As the Trade Court indicated, the product specifications and marketing materials submitted by Risen do not provide better information than the definitions found in the ASTM standards. *See Risen II*, 611 F. Supp. 3d at 1392–93. Beyond identifying backsheet and EVA as "film," the materials submitted by Risen do not demonstrate why those inputs are considered "film" or shed light on the distinction between "sheet" and "film." Further, at least as to EVA, these materials use the terms "sheet" and "film" interchangeably, such that the use of the term "film" in those materials is stripped of any definitional quality that it might otherwise hold.[3]

Nor are we persuaded that Commerce erred by selecting new HTS categories for Risen's inputs in this review. "Commerce may change its conclusions from one review to the next based on new information and arguments, as long as it does not act arbitrarily and it articulates a reasonable basis for the change." *Qingdao Sea-Line*, 766 F.3d at 1387. Here, Commerce provided

---

[3]    Risen additionally argues that flexibility should have been the distinguishing characteristic to select between the "sheet" and "film" HTS categories for its backsheet and EVA inputs. However, all the HTS categories in dispute here cover materials that are non-rigid, so flexibility is not an appropriate means of distinguishing between them.

sufficient explanation for why the HTS categories for "sheet" were preferable to the HTS categories for "film" in this Sixth Administrative Review.

Commerce explained that it chose the HTS category applicable to "sheet" for Risen's backsheet, but did not do so in prior reviews, because the ASTM standards were placed on the record here, whereas Commerce did not have the benefit of those standards in previous reviews. That is sufficient to sustain Commerce's determination, as Risen has not shown that "Commerce consistently followed a contrary practice in similar circumstances and provided no reasonable explanation for the change in practice." *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003).

We further agree with the Trade Court that Commerce's characterization of EVA as "sheet" as opposed to "film" was not inconsistent with Commerce's selection of HTS categories in prior administrative reviews where Thailand was selected as the surrogate country. *Risen II*, 611 F. Supp. 3d at 1393–94. In those proceedings, Commerce used an "other" Thai HTS category that covered "plates, sheets, film, foil and strips of polymers of ethylene." J.A. 19. Commerce explained that Thailand's tariff schedule did not distinguish between "sheet" and "film" of polyethylene, but instead grouped them together in a single category. Malaysia, by contrast, had separate categories for polyethylene "sheet" and "film." Using Malaysia's more precise HTS categories, Commerce determined that the category applicable to "sheet" more appropriately matched Risen's EVA input. But Commerce did not, as Risen contends, previously classify Risen's EVA input as a "film" rather than a "sheet."

We conclude that Commerce's classifications of Risen's backsheet and EVA inputs under the Malaysia HTS categories applicable to "sheet" were reasonable and supported by substantial evidence. We affirm the Trade

Court on this point. We further reject Risen's alternative argument that Commerce should have calculated surrogate values by averaging the values applicable to the HTS categories for "sheet" and "film" for each of its inputs because we do not find the record ambiguous on this issue.

## II

The second issue is whether Commerce properly characterized certain unidentified costs in the 2018 Hanwha financial statement as overhead.

Separate from physical inputs, Commerce must calculate surrogate financial ratios for manufacturing overhead, selling, general, and administrative expenses, and profit. *See* 19 U.S.C. § 1677b(c)(1)(B). Commerce often uses the financial statements of producers of comparable merchandise in a surrogate country as sources from which to derive its surrogate financial ratios. *See, e.g.*, *Ad Hoc Shrimp Trade Action Comm.*, 618 F.3d at 1319; *Qingdao Sea-Line*, 766 F.3d at 1387.

Although Commerce enjoys discretion in how it calculates surrogate financial ratios, *see Fujitsu Gen. v. United States*, 88 F.3d 1034, 1045 (Fed. Cir. 1996), including in how it "valu[es] the factors of production on which factory overhead is based[,]" *Magnesium Corp. of Am. v. United States*, 166 F.3d 1364, 1372 (Fed. Cir. 1999), "[a]n overriding purpose of Commerce's administration of the antidumping laws is to calculate dumping margins as accurately as possible." *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013) (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990)). Commerce is required to demonstrate that its calculations are supported by "substantial evidence" and otherwise "in accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i); *see, e.g.*, *US Magnesium LLC v. United States*, 839 F.3d 1023, 1026 (Fed. Cir. 2016); *SolarWorld*, 910 F.3d at 1222. "This standard requires Commerce to examine the record and

articulate a satisfactory explanation for its action." *Yangzhou Bestpak Gifts & Crafts*, 716 F.3d at 1378; *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1376 (Fed. Cir. 2016). Stated differently, Commerce bears the burden of demonstrating that its conclusions are of a kind that a reasonable mind might accept as adequately supported when viewing the record as a whole. *See Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1374 (Fed. Cir. 2015). Speculation and guesswork are not substitutes for substantial evidence. *See Yangzhou Bestpak Gifts & Crafts*, 716 F.3d at 1378; *Seah Steel Vina Corp. v. United States*, 950 F.3d 833, 847 (Fed. Cir. 2020).

Risen primarily argues that Commerce's surrogate overhead ratio calculation is not supported by substantial evidence because Commerce's calculation is not supported by the financial statement on which Commerce relies. The Trade Court observed that Commerce's explanation for why it determined that unidentified costs were allocable to overhead "could be clearer," but nonetheless sustained Commerce's determination. *Risen I*, 569 F. Supp. 3d at 1332. We think Commerce's approach is so unclear that it is insufficient.[4]

---

[4] Contrary to the Dissent at 2, in holding that Commerce's explanation is insufficient, we are not going beyond the parties' arguments. We are simply holding that the explanation given was insufficient because it lacked substantial evidence (as argued by Risen) but that Commerce should be given a second opportunity to explain why it reached the correct result notwithstanding the lack of substantial evidence for its original theory. Risen explicitly sought a remand. In any event, we cannot review a decision that we cannot understand. "[T]he courts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review . . . .

Commerce began calculating its overhead ratio by selecting the 2018 Hanwha financial statement as the best available information from which to derive its surrogate ratios. Risen does not object to Commerce's selection of this financial statement as the best available information. Using that statement, Commerce calculated a final overhead ratio of 21.70 percent for Risen by dividing what it deemed "overhead costs" by the costs for materials, labor, and energy ("MLE").[5]

Commerce began its analysis with Hanwha's costs of goods sold, which was 2,003,400 Malaysian ringgits.[6] From that total, Commerce sought to identify what proportion of the costs of goods sold represented MLE. Note 17 to the financial statement explained that, of the total costs of goods sold, 1,648,000 ringgits are attributable to "inventories." Commerce considered these inventory costs to be roughly synonymous with Hanwha's total MLE costs, based on Note 2.12 of the financial statement. That Note provided as follows:

---

[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted b[e] clearly disclosed and adequately sustained." *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943).

[5] The parties do not explain the impact that Commerce's ultimate overhead calculation had on the final dumping margin applied to Risen. We assume, based on the statutory scheme and the nature of the parties' dispute, that a larger overhead ratio correlates to an increase in normal value which, in turn, will lead to a higher dumping margin for an exporter. *See* 19 U.S.C. § 1677b(a).

[6] The financial statement specifies that these values are shown in the thousands of ringgits.

> Costs incurred in bringing the Inventories to their present location and condition are accounted for as follows: . . .
>
> Finished goods and work-in-progress: costs of direct materials and labour and a proportion of manufacturing overheads based on normal operating capacity.

J.A. 6666. Commerce concluded that Note 2.12's reference to a "proportion of manufacturing overheads based on normal operating capacity" was "a reference largely to energy costs" and not production overhead. J.A. 7165–66. Based on this assumption, after minor adjustments to account for the change in goods in inventory, Commerce determined that Hanwha's overhead expenses totaled essentially the difference between its costs of goods sold and inventory costs.

Commerce concluded that the difference had to be overhead (other than energy costs) because Commerce had already identified MLE costs (as included in inventories) and "the income statement explicitly identifies the sales, general, administrative, and interest costs . . . as separate line items." J.A. 7132. Stated differently, Commerce found that because Hanwha's financial statement "specifies that MLE costs are included in the 'Inventories' portion of the '[c]ost of sales,' . . . the remaining, unidentified costs of sales were not MLE but rather overhead." Appellee Br. 37.

Commerce's theory does not appear to be supported by the financial statement upon which it relies. The inclusion of MLE costs in "inventories" does not preclude the possibility that manufacturing overhead would also be included in inventory costs. In fact, it appears that this is precisely what occurred here, as stated in Note 2.12 to the financial statement.

Nonetheless, Commerce argues that its calculation is supported by substantial evidence because the Hanwha

financial statement was composed in compliance with the IFRS standard applicable to inventories.[7]  The standard does not support Commerce's approach.  The standard explains that inventories should include "a systematic allocation of fixed and variable production overheads that are incurred in converting materials into finished goods." Int'l Fin. Rept. Standards Found., IAS 2 Inventories ¶ 12 (Mar. 2024) ("IAS 2").

Given the similarity in language, we understand the standard's use of the term "production overheads" to be synonymous with the term "manufacturing overheads" in Note 2.12 of the Hanwha financial statement.  As we have explained, and as Note 2.12 confirms, manufacturing overheads already were included in Hanwha's inventory costs.  J.A. 6666.

We are not persuaded by Commerce's argument that it was reasonable to understand the phrase "a proportion of manufacturing overheads" in Note 2.12 to be "a reference largely to energy costs" included in inventories.  J.A. 7165–66; Oral Arg. at 31:34–45.  At no point has Commerce provided an adequate explanation or, indeed, any explanation for why it drew this conclusion.  Further,

---

[7]    Risen suggests that Commerce's reliance on the IFRS standards is no more than post hoc rationalization for its overhead calculation, as Commerce first introduced the IFRS standards during oral argument before the Trade Court.  "Agency action cannot be sustained on post hoc rationalizations supplied during judicial review." *Timken Co. v. United States*, 894 F.2d 385, 389 (Fed. Cir. 1990) (quoting *Tabor v. Joint Bd. for Enrollment of Actuaries*, 566 F.2d 705, 709–10 (D.C. Cir. 1977)).  We need not decide the issue of whether Commerce impermissibly attempted to justify its actions after the fact because, for the reasons we explain, Commerce's explanation is inadequate, regardless of when it was first raised.

nothing in the Hanwha financial statement or the IFRS standard can be read to suggest that proportional "production overheads" are coterminous with, or even largely made up by, a company's energy costs, as Commerce asks us to conclude.

Finally, Commerce suggests that under the IFRS standard, inventory costs do not include fixed overhead costs and that those fixed expenses would be allocable to overhead separately from inventories in the costs of goods sold. Appellee Br. 35. This is an incorrect interpretation of the standard, which requires "*fixed* and variable production overheads that are incurred in converting materials into finished goods" to be allocated on a systematic basis to the cost of inventories. IAS 2 ¶ 12 (emphasis added). To be sure, the standard states that "administrative overheads that do not contribute to bringing inventories to their present location and condition[,] and selling costs" are to be excluded from the inventories total. IAS 2 ¶ 16. But the fact that administrative overheads and selling costs are excluded from the inventories total does not mean that those costs are additional overhead included in the costs of goods sold, as Commerce suggests. Indeed, the Hanwha financial statement specifically identifies the company's "[s]elling and administrative expenses" separately from cost of goods sold, consistent with the standard. J.A. 6648.

On the present record, Commerce's allocation of the remaining 257,063 ringgits in unidentified costs to overhead appears to be based on nothing more than guesswork or speculation, not substantial evidence. Accordingly, we vacate the judgment of the Trade Court sustaining Commerce's determination and remand the matter back to Commerce for further proceedings to give

Commerce an opportunity to identify substantial evidence for its calculation.[8]

### CONCLUSION

We sustain the Trade Court's affirmance of Commerce's categorization of Risen's backsheet and EVA inputs under the Malaysia HTS categories applicable to sheet. We vacate the Trade Court's decision sustaining Commerce's surrogate financial ratio calculation for overhead. We direct the Trade Court to remand the matter regarding the overhead issue to Commerce for further proceedings consistent with this opinion.

**AFFIRMED IN PART, VACATED
AND REMANDED IN PART**

### COSTS

No costs.

---

[8] Such a remand is particularly appropriate because Risen also has provided no valid explanation for the difference between costs of goods sold and inventories in the Hanwha financial statement. Risen's contention that the unidentified remaining costs should be considered additional MLE is unsupported. The IFRS standard provides that the cost of inventories shall include "*all* costs of purchase, costs of conversion . . . and other costs incurred in bringing the inventories to their present location and condition," IAS 2 ¶ 10 (emphasis added), and nothing in the Hanwha financial statement suggests that the company deviated from that requirement.

# United States Court of Appeals
# for the Federal Circuit

---

**RISEN ENERGY CO., LTD.,**
*Plaintiff-Appellant*

**TRINA SOLAR CO., LTD., ET AL.,**
*Plaintiffs*

**CANADIAN SOLAR INC., CANADIAN SOLAR INTERNATIONAL LIMITED, CANADIAN SOLAR MANUFACTURING (CHANGSHU), INC., CANADIAN SOLAR MANUFACTURING (LUOYANG), INC., CSI CELLS CO., LTD., CANADIAN SOLAR (USA), INC.,**
*Plaintiffs-Appellees*

**v.**

**UNITED STATES**
*Defendant-Appellee*

**SUNPOWER MANUFACTURING OREGON, LLC,**
*Defendant*

---

2023-1550

---

Appeal from the United States Court of International Trade in No. 1:20-cv-03743-CRK, Judge Claire R. Kelly.

---

STARK, *Circuit Judge*, concurring-in-part and dissenting-in-part.

I agree with the majority that Commerce's surrogate values for Risen's backsheet and EVA inputs are supported by substantial evidence. Accordingly, I join in that portion of the majority opinion. *See* Maj. at 7-12. However, I believe that Commerce's surrogate financial ratio calculations are also supported by substantial evidence. Therefore, I would affirm the judgment of the Court of International Trade ("Trade Court"), which reached this same conclusion, in its entirety.

I

As an initial matter, I choose not to join the majority on the surrogate financial ratios issue because the majority faults Commerce on grounds that the appellant, Risen, has not raised. And it provides relief, a remand, that Risen never requested.

A

The majority is vacating and remanding because "Commerce's approach is so unclear that it is insufficient." Maj. at 13; *see also id.* at 16 n.7 ("Commerce's explanation is inadequate, regardless of when it was first raised."). Yet at no point, at either the Trade Court or here, has Risen, the party that brings this case to us, argued that Commerce's approach is unclear.

Risen understands what Commerce did in calculating the surrogate financial ratios and why it did so. It just disagrees with Commerce – and, before us, insists that Commerce's determination is not supported by substantial evidence. As Risen accurately summarizes, "Commerce *explained* that it understood that labor and energy were already included in the [materials labor and energy ("MLE")] denominator because the 'Inventories' line item [in the Hanwha Q Cells Malaysia ("Hanwha") financial statement] included these expenses." Open. Br. at 22 (emphasis

added).  The sole issue Risen presses has nothing to do with the quality or content of Commerce's explanation.  Instead, it is only whether the decision by Commerce is "contrary to the evidence in Hanwha's financial statement and contrary to basic accounting" and, as a result, unsupported by substantial evidence.  Open. Br. at 22.

The majority claims that it is "not going beyond the parties' arguments" and is "simply holding that the explanation given was insufficient *because* it lacked substantial evidence."  Maj. at 13 n.4 (emphasis added).  But the majority points to nowhere that Risen actually argued either that Commerce's explanation was insufficient or that the purported lack of substantial evidence has anything to do with the clarity of Commerce's explanation.  Risen's briefing makes clear it did not raise either of these points.  *See, e.g.*, Open. Br. at 6 ("Commerce calculated the surrogate financial ratios in a manner unsupported by the record. . . . The resulting calculation significantly overstated the overhead costs [and was] [c]ontrary to accounting principles, Commerce's usual understanding of ratio calculations, and the information in the financial statement itself."); *id.* at 20 ("Commerce's calculation of the financial ratios are inaccurate [and] does not reasonably interpret the record information in the financial statement . . . ."); *id.* at 21-22 ("[Commerce's allocation of remaining costs to overhead, instead of MLE,] is contrary to Commerce's practice and contrary to the notes of the [Hanwha] statement."); Reply Br. at 7 ("[Commerce's] allocation is contrary to the notes of the statement and accounting principles."); *id.* at 11 ("Commerce has calculated inaccurate ratios not based on substantial evidence . . . .").

While "Commerce is required to demonstrate that its calculations are supported by 'substantial evidence,'" Maj. at 12 (citing 19 U.S.C. § 1516a(b)(1)(B)(i)), and as the Trade Court noted, "Commerce's reasoning could be clearer," J.A. 51, there is still, in my view, a crucial distinction between an appeal challenging the substantiality of record evidence

– asking us to reverse a trial court – and an appeal challenging the adequacy of an explanation – and seeking, as an alternative to reversal, remand for the trial court (or originating agency) to "articulate a satisfactory explanation," *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013). When, as here, an appeal presents only the first type of challenge, we should focus our review on whether there is substantial evidence, rather than imposing a remand sought by neither party.

"In our adversary system . . . we follow the principle of party presentation," which instructs us to "rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). Hence, the Supreme Court has been clear that, with rare exceptions, "in both civil and criminal cases, in the first instance and on appeal," *id.*, we should "decide only questions presented by the parties," *United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020). We have ourselves on multiple occasions recognized this constraint on our review, including very recently in *Astellas Pharma, Inc. v. Sandoz Inc.*, 117 F.4th 1371, 1377 (Fed. Cir. 2024), where we vacated a judgment of patent invalidity because "the district court disregarded the longstanding principle of party presentation and, in doing so, abused its discretion."

The majority does not attempt to show the presence of circumstances that could make it "appropriate" for us "to take a 'modest initiating role' in the shape of the litigation." *Astellas*, 117 F.4th at 1377 (quoting *Sineneng-Smith*, 590 U.S. at 376). In my view, then, we should limit our review to considering whether or not there is substantial evidence to support Commerce's calculation of the surrogate financial ratios.

## B

The majority says that Risen "explicitly sought a remand." Maj. Op. at 13 n.4.  I disagree.

The only reference Risen has made to a possible remand is an aside in the middle of its *reply* brief, which is untimely.  *See In re Cygnus Telecomms. Tech., LLC Patent Litig.*, 536 F.3d 1343, 1356 (Fed. Cir. 2008) (holding appellant forfeited argument for reversal of summary judgment by failing to raise request in opening brief); *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief are waived.").  In any event, even the tangential, belated reference to a remand cannot fairly be read as an actual request.  Instead, in the course of complaining that the IFRS standards only first came up at the Trade Court, Risen observes that "[t]his has made briefing at the Court more cumbersome" and then adds: "This alone should require remand to Commerce to consider as it is an agency role to do in the first instance on all issues."  Reply Br. at 7.  But Risen never *asks* for such a remand – and most certainly not on the grounds of a purportedly unclear explanation by Commerce.

Rather, Risen is consistent and explicit about its sole goal on appeal, which is reversal of the Trade Court's entry of judgment for the government.  In both its Opening and Reply Briefs, under sections headed "Conclusion and Statement of Relief Sought," it writes a single, identical sentence:

> In light of the foregoing, Plaintiff-Appellant requests that this Court enter judgment in its favor and find Commerce's determination of the best available information for backsheet and EVA and Commerce's financial ratio calculation are not supported by substantial evidence.

Open. Br. at 27; Reply Br. at 12 (same).

Therefore, I would limit our review to deciding whether to reverse or affirm the Trade Court's judgment, which I will turn to now.

II

The question actually presented in this appeal is far easier to state than it is to answer. As context, it is undisputed that because Risen is a Chinese company, and China has a nonmarket economy, Commerce had to calculate a dumping margin by using surrogate values – here, from Malaysia – to estimate the "normal value" at which Risen would sell its products in its home market (China). There is no challenge before us to Commerce's decision to use the financial statement of a Malaysian manufacturer of solar cells, Hanwha, as the best available information from which to calculate the necessary surrogate financial ratios, such as overhead ratio. There is also no disagreement between the parties that what Commerce did, as pertinent to this appeal, was to start with Hanwha's reported "cost of sales," RM2,003,400 (Malaysian ringgits), subtract certain costs appearing on other lines in Hanwha's statement – including inventories, which note 17 of the Hanwha financial statement reports as RM1,648,000 for 2018, adjusted to RM1,646,244 for the change in finished goods[1] – and end up with RM257,063 of unidentified costs. J.A. 7149; *see also* Open. Br. at 22; Gov't Br. at 32-33. The only point of contention concerns the proper treatment of this unidentified amount: Commerce allocated it to overhead, putting the RM257,063 in the numerator of the particular ratios, while Risen prefers to allocate it to MLE – that is,

---

[1]    The other costs subtracted from the cost of sales are RM6,767 for "depreciation property" and RM93,326 for "depreciation of plant and equipment." J.A. 7149.

materials, labor, and energy – which would put it in the denominator of the ratios.

In my view, Commerce had substantial evidence for its decision to allocate the unidentified costs to overhead. That becomes clear when looking more closely at what Commerce did and why.

The issue of how to allocate the unidentified costs was first addressed by Commerce in its Preliminary Results issued in January 2020. *See* J.A. 6838-39 (calculating 6.29% overhead ratio). In those Preliminary Results, Commerce used a "constructed MLE" for Hanwha. J.A. 7131. Both the petitioner in the administrative review (SolarWorld Americas Inc.) and Risen sought adjustments to the Preliminary Results and, consequently, Commerce, having not done so before, considered two notes in the Hanwha financial statement: note 2.12, describing what Hanwha included in its reported "Inventories," and note 17, reporting figures for 2017 and 2018 "Inventories." J.A. 6666, 6688. Commerce found that these notes, which I describe in more detail below, "specifically identified direct product costs," making the reported Inventories figure "a more appropriate reflection of MLE" than the constructed figure on which Commerce had earlier relied. J.A. 7131. Based on this new insight, in its Final Results, issued in October 2020, Commerce decided to "treat[] the difference between the total manufacturing costs and MLE" – that is, the unidentified costs – "as overhead costs." J.A. 7132; *see also* J.A. 7133 ("[B]ased on the information contained in the [Hanwha] financial statements, we have concluded that the remaining unidentified costs are overhead costs."); *id.* (calculating 21.70% overhead ratio).[2] Risen disagreed with Commerce,

---

[2]    As the government notes, "Risen does not challenge Commerce's determination to move from a constructed value to a calculated value for MLE between the preliminary and final results." Gov't Br. at 33-34 n.7.

insisting "it is Commerce practice to classify unidentified costs in financial statements as [MLE] costs" and not overhead. J.A. 7133. Commerce responded that it was "unaware of any such practice." *Id.*

Thereafter, in a November 2, 2020 memo responding to allegations of ministerial errors in the Final Results, Commerce stated that it had calculated the surrogate financial ratios based "solely on the financial statements of Hanwha." J.A. 7165. Commerce explained:

> In doing so, we determined that labor and energy, as well as material costs, were included in the category identified as "inventories recognized as an expense in cost of sales." We made this conclusion based in part on the statement from the financial statements that "inventories" include "costs of direct materials and [labor] and a proportion of manufacturing overheads based on normal operating capacity." We believed the "proportion of manufacturing overheads based on normal operating capacity" to be a reference largely to energy costs.

J.A. 7165.

In other words, Commerce read Hanwha's financial statement as disclosing that all MLE costs were already included in "Inventories," which, in turn, meant that the unidentified costs must be overhead, because if any of the unidentified costs were actually materials, labor, or energy then those costs would have already been included in Inventories. *See* J.A. 7166 ("[W]e treated the 'Inventories' expense [in Hanwha's financial statement] as materials, labor, and energy expenses which we included in the denominator of the surrogate financial ratios."). In making this factual determination, Commerce again rejected Risen's contention that Commerce was departing from past practice, as its decision was based on the "specific statement in the [Hanwha] financial statements indicating" that "labor and energy were included in the 'Inventories.'"

*Id.*; *see also id.* (Commerce stating it "made a methodological decision based on record information").[3]

Commerce's reading of the Hanwha financial statement – that Hanwha's reported inventories included all MLE, so the unidentified costs cannot also be MLE but instead should be allocated to overhead – was reasonable and supported by substantial evidence. Commerce based its conclusion primarily on note 2.12 of Hanwha's statement. Note 2.12, entitled "Inventories," begins by referencing "Costs incurred in bringing the inventories to their present location and condition," J.A. 6666, which Commerce reasonably understood to be a category of costs that includes the cost of *energy* to make and move the items found in inventory. The note then continues:

> [These costs] are accounted for as follows:
>
> *Raw materials*: purchase costs are derived by using the weighted average cost method.
>
> Finished goods and work-in-progress: costs of direct *materials and labour* and a proportion of manufacturing overheads based on normal operating capacity.[4] These costs are assigned by using the weighted average cost method.

---

[3]    Commerce also relied on note 17, also entitled "Inventories," which includes this text: "During the year [2018], the amount of inventories recognised as an expense in cost of sales of the Group and of the Company were RM1,648 million (2017: RM2,142 million)." J.A. 6688.

[4]    As government counsel explained at oral argument, "Commerce, knowing how to interpret financial statements, knows that that [i.e., 'manufacturing overheads based on normal operating capacity'] means energy."

J.A. 6666 (emphasis added). In sum, then, as can be seen, the note expressly references materials and labor, and implicitly describes energy.

Thus, I agree with the Trade Court that it was "reasonable" for Commerce to have "relied in part" on note 2.12 "as evidence that labor and energy costs are included in the valuation of" Hanwha's inventories. J.A. 53-54. I further agree with the Trade Court that this understanding of the Hanwha statement gains further support from the fact that the statement was prepared in accordance with the IFRS. J.A. 54; *see also* J.A. 6653 ("The financial statements of the [Hanwha] Group and of the Company have been prepared in accordance with . . . [the IFRS]."). IFRS Standard IAS2, which "provid[es] guidance for determining the cost of inventories and the subsequent recognition of the cost as an expense," requires that "financial statements expense all variable costs in the cost of inventory." J.A. 54 & n.30. There is no dispute that materials, labor, and energy are variable costs. Hence, as the Trade Court concluded, we "can reasonably discern from Commerce's citation to both Notes 2.12 and 17 that Commerce believes that because Hanwha's financial statement is compliant with IFRS, it must include labor and energy costs in inventories cost." J.A. 54-55. And "[h]aving accounted for MLE, depreciation, and the change in finished goods balance, Commerce

---

Oral Arg. at 23:40-50, available at https://oralarguments.cafc.uscourts.gov/default.aspx?fl=23-1550_09032024.mp3; *see also* J.A. 7165-66 (Commerce considering, and rejecting, Risen's contention that "energy expenses are not specifically identified in the financial statements"). Risen identifies no persuasive reason to doubt Commerce's understanding, although it would have been better practice for Commerce to have provided more detail as to its reasoning.

reasonably allocated the remaining amount of the cost of sales balance to overhead."  J.A. 55.

I agree with this analysis of the Trade Court, which (along with what I have set out here) describes the substantial evidence basis for Commerce's decision.  While, of course, Commerce could have done a better job explaining itself, it does not follow that, as my colleagues conclude, Commerce's decision was "based on nothing more than guesswork or speculation."  Maj. at 17.  Commerce's finding was grounded in the record evidence and its explanation of its reasoning was adequate to enable appellate review.  The Trade Court was right to affirm.

### III

Commerce confronted a complicated, case-specific fact question, calling on its expertise and experience with financial statements and accounting standards.  It was a question that the government candidly acknowledges (as do I) has no "black-and-white answer."  Oral Arg. at 26:11-22.  Reasonable minds could well differ as to whether the unidentified costs in the Hanwha financial statement should be allocated to MLE or to overhead.  But "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  At best for Risen, that is the situation presented by this appeal.

Accordingly, we should affirm the Trade Court's affirmance of Commerce's determination of the surrogate financial ratios.  Thus, I respectfully dissent from the majority's decision to remand this issue for further proceedings.